WESTERN UNION TELEGRAPH CO. et al. v. AMERICAN BELL TELEPHONE CO.

(Circuit Court, D. Massachusetts. February 20, 1911.)

No. 89.

1. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACT BETWEEN COMPANIES—ACCOUNTING.

Complainant transferred to defendant all of its telephone business and patents relating thereto, under a contract by which defendant agreed to pay to complainant 20 per cent. of all rentals or royalties received from licenses or leases for telephones. Defendant granted perpetual licenses to local companies and exchanges, receiving without other payment therefor a proportion of the stock of each local company and also rentals for the instruments used by it. *Held*, on an accounting between the parties under the contract, after a decree of the court holding that such stock received for licenses was rentals or royalties within the meaning of the contract for which defendant was required to account as trustee, that defendant was not relieved from accounting for 20 per cent. of the same by the fact that the licenses also included the right to use subsidiary inventions, such as call bells and switchboards, and to do an extraterritorial business by means of long-distance lines; such rights being merely incidental, and to a large extent a necessary incident, to the main grant, which was of the right to use telephones, and defendant also having re-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ceived a separate consideration for such minor grants, in the way of rentals and royalties.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 10; Dec. Dig. § 16.*]

2. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACT BETWEEN COMPANIES—ACCOUNTING.

The value to the local companies of a connection with defendant, which was a large and wealthy corporation interested in exchanges throughout the country and controlling many patents, was too general and indeterminate in character to entitle defendant to have it considered on the accounting as a part consideration which it paid for the stock.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 16.*]

3. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACTS BETWEEN COMPANIES—ACCOUNTING—EXPENDITURES.

Where defendant held stock in certain corporations a percentage of which belonged to complainant under a contract between them, expenditures made or services rendered by defendant to increase the value of the stock, after notice of complainant's claim, which it denied, could not be charged to complainant to diminish its interest.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 16.*]

4. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACTS BETWEEN COMPANIES—DIVISION OF RENTALS FOR TELEPHONES.

Complainant transferred to defendant its telephone business and certain patents relating to telephones under a contract by which defendant agreed to pay to complainant 20 per cent. of all it received as rentals or royalties from licenses or leases for telephones. The contract was to continue in force for 17 years. Defendant granted to local companies perpetual licenses under its patents, receiving therefor, in addition to rentals for telephones furnished, a certain proportion of the stock of the companies. Held, on an accounting under the contract pursuant to a decree finding that such stock was rentals or royalties within the meaning of the contract, that complainant was entitled to 20 per cent. of such stock, without diminution by apportionment of the same between the contract period, which covered the life of the patents, and futurity.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 16.*]

5. TELEGRAPHS AND TELEPHONES (§ 16*)—CONSTRUCTION—DIVISION OF RENTALS FOR TELEPHONES.

Under a contract between the parties, defendant was to pay to complainant 20 per cent. of the net rentals received by it from licenses or leases to use telephones to be computed upon the then standard rental of $10 an instrument, unless increased by defendant, and in case the lines or exchanges were owned by defendant in whole or in part, or by auxiliary companies in which it was interested, it was entitled to deduct a commission of 30 per cent. from the gross rentals received. It granted licenses to auxiliary companies, receiving a part of the stock of each, which stock was held by the court to be rentals under the contract for which it was accountable to complainant. The licensees collected the rentals of $10 an instrument from subscribers, retained 30 per cent., and paid the remainder over to defendant. Held, on an accounting under the contract, that the net cash rentals received by defendant, 20 per cent. of which it was required to pay complainant under the contract, consisted of the $7 an instrument; the 30 per cent. having been deducted from the gross rentals by the licensees, while the net stock rental was the stock received less the 30 per cent. which it was entitled to deduct as commission.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 16.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6. TELEGRAPHS AND TELEPHONES (§ 16\*)—CONTRACTS BETWEEN COMPANIES— DECREE FOR ACCOUNTING—CONSTRUCTION.**

Where a decree directing an accounting, under a contract by which complainant transferred certain patents relating to telephones to defendant, which was to pay to complainant a percentage of all rentals received by it from licenses or leases of telephones excluded from such accounting anything received by defendant in any form which was properly the equivalent of anything it possessed when the contract was made, stock in another corporation to which defendant was then entitled under a prior contract was within the exception and excluded, although not actually received until afterward.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 16.\*]

In Equity. Suit by the Western Union Telegraph Company and others against the American Bell Telephone Company. On exceptions to master's report. Exceptions overruled, and decree entered for complainants.

John F. Dillon, Rush Taggart, and J. H. Benton, Jr., for complainants.

John C. Gray, Frederick P. Fish, Roland W. Boyden, and Charles H. Swan, for defendant.

COLT, Circuit Judge. This bill was brought by the Western Union Telegraph Company and others in the same interest against the American Bell Telephone Company for an accounting under a contract between the parties dated November 10, 1879; and the case is now before the court on exceptions to the report of the master appointed to take the accounting in accordance with the decree and opinion of the Circuit Court of Appeals. The opinion is reported in 125 Fed. 342, 60 C. C. A. 220.

The consolidated statement of the master's award is as follows:

I. Stock:

| | |
|---|---|
| Number of shares claimed by the plaintiffs | 38,188.9938 |
| Number of shares exempted from the accounting | 18,101.1681 |
| Number of shares for which defendant is held to be accountable | 20,087.8257 |

II. Cash:

| | |
|---|---|
| Cash claimed by plaintiffs | $5.873,292.42 |
| Cash exempted from the accounting | $3,293,377.78 |
| Net amount found due from defendant to plaintiffs under the accounting | $2,579,914.64 |

The subject-matter of the accounting was certain shares of stock received by the Bell Company from its licensee companies under telephone license contracts. The Western Union claimed that, under the contract of November 10, 1879, it was entitled to 20 per cent. of this stock, together with the dividends and interest thereon. This claim, as stated in the master's award, amounted to 38,188.9938 shares of stock and $5,873,292.42 cash. The master held the Bell Company accountable for 20,087.8257 shares of this stock and $2,579,914.64 cash. The master exempted from the accounting the stock received by the Bell Company under four of these license contracts.

---

The taking of this account has occupied some five years. The report of the master comprises 70 printed pages, exclusive of the opinion of the Circuit Court of Appeals and various exhibits. The report is compact and comprehensive in statement, and clear in its reasoning and analysis. The account involved the investigation of a complicated state of facts and many details. It also involved the consideration of the rules governing the accounting as laid down in the opinion of the Circuit Court of Appeals. The report exhibits a thorough knowledge of all these facts and details, and a careful study of the principles governing the accounting. During the accounting the counsel raised many difficult and important questions. The master has fully heard the parties upon these questions, and duly weighed the arguments upon both sides before making his rulings. The findings of the master on questions of fact should stand unless some error clearly appears, and his rulings on questions of law should receive the careful consideration of the court.

The plaintiffs have taken 10 exceptions, and the defendant 47 exceptions, to the master's ruling. These exceptions have been fully presented to the court upon exhaustive printed briefs and oral arguments. Under these exceptions this court is asked to review substantially all the important rulings of the master.

The main controversy before the master was over the opinion of the Circuit Court of Appeals; in other words, over the principles governing the accounting as laid down by that court in its opinion. The counsel differed widely as to the meaning, scope, and effect of that opinion. They differed widely as to what that court had decided and what it had not decided.

The plaintiffs contended that upon the true interpretation of that opinion the master should have ruled that they were entitled to all the stock and cash claimed by them. The defendant contended that upon the true interpretation of that opinion the master should have ruled that nothing was due the plaintiffs.

Stated more fully: The plaintiffs contended that the Circuit Court of Appeals, upon bill, answer, and proofs, had decided that, under the contract of November 10, 1879, this stock was rentals or royalties for licenses to use telephones, and that the defendant must account for 20 per cent. of this stock, together with the dividends and interest thereon; and the plaintiffs' exceptions are mainly directed to the rulings of the master exempting from the accounting that portion of this stock which was received by the defendant under four license contracts.

On the other hand, the defendant contended as follows:

The Circuit Court of Appeals has not decided that any portion of this stock was rentals or royalties for licenses to use telephones under the contract of November 10, 1879. It has only decided the abstract proposition that under the contract of November 10, 1879, owing to the fiduciary relation between the parties, rental does not mean a fixed, unchangeable sum, and that it includes stock received as rental as well as money received as rental. It follows that the plaintiffs must now go ahead and prove their case; in other words, that they must now show what portion, if any, of this stock was received as rental. In

order to prove this, it is necessary first to determine the meaning of rental in the contract of November 10, 1879. Now rental in the contract may have two meanings. It may mean either (1) the sum paid by the telephone user to the licensee company, or (2) the sum paid by the licensee company to the defendant. If the former is the true theory of rental, which the Bell Company most strenuously maintains, then this stock is not rental, and consequently not subject to any accounting. If the latter is the true theory of rental, then certain consequences follow. Among these consequences are the following:

(1) Under the decision of the Circuit Court of Appeals the defendant is only to account for such portion of this stock as was received for licenses to use and rent telephones.

(2) This stock is not to be attributed solely to the right or license to use and rent telephones, but to various considerations both within and outside of the license contracts. Among the considerations for this stock other than the right to use and rent telephones are: (a) The value of connection with the Bell system; (b) the value of the right to use subsidiary apparatus; (c) the value of the right to carry on the extraterritorial business; (d) the value of the surrender of options.

(3) If any portion of this stock is determined to be rentals or royalties for licenses to use and rent telephones, the plaintiffs are only entitled to 20 per cent. of the dividends thereon prior to November 1, 1896, the date of the expiration of the contract of November 10, 1879. If, instead of sharing in said dividends, the plaintiffs are entitled to any part of the stock itself, an apportionment must be made between the temporary period of the contract ending November 1, 1896, and the indefinite future period over which the perpetual license contracts extended; and the plaintiffs are entitled to share only in the portion of the stock properly attributable to this temporary period.

(4) Upon this theory of rental under the contract of November 10, 1879, the account for cash rentals already settled between the parties must be reopened and readjustments made. One of the adjustments which should be made is an allowance of 30 per cent. commissions on the annual cash rentals already accounted for.

(5) The defendant is entitled to certain credits for what it has done for the benefit of this stock. In other words, such allowances should be made as might be determined to be equitable for expenses incurred and services rendered by the defendant for the benefit of the licensee companies whereby the value and earning power of the stock was increased.

(6) The burden of proof is upon the plaintiffs.

The defendant's exceptions are directed mainly to the master's rulings on these various propositions.

The master was directed to take this accounting in accordance with the opinion of the Circuit Court of Appeals, and his most important rulings are based upon his interpretation of that opinion. In order, therefore, to pass upon the exceptions, it is necessary first to understand the opinion of the Circuit Court of Appeals. In a broad sense, it may be said that the question now before the court is: What is the true interpretation of the opinion of the Circuit Court of Appeals?

In other words: What has that court decided, and what has it left open?

To an intelligent understanding of the opinion of the Circuit Court of Appeals, it is necessary to have some knowledge of the history of this case, and particularly of the issue and record upon which the decree for an accounting and the opinion were based.

The bill was brought in 1883. Upon the completion of the pleadings the whole case was referred to the Honorable John Lowell as master. The master filed his report in 1891. He found in favor of the defendant. The plaintiffs filed exceptions to the master's report only in matters of law. The defendant took no exceptions. The case then came to the Circuit Court on the plaintiffs' exceptions. The Circuit Court overruled the exceptions, and on June 11, 1901, entered a decree confirming the master's report and dismissing the bill. The plaintiffs then appealed to the Circuit Court of Appeals, and on November 6, 1903, that court entered the following decree:

"The decree of the Circuit Court is reversed; the case is remanded to that court to enter a decree for the complainants for an accounting, and for further proceedings in accordance with our opinion, and the appellants recover their costs of appeal."

On February 1, 1904, Everett W. Burdett, Esq., was appointed by this court special master, to take the account in accordance with the decree and opinion of the Circuit Court of Appeals.

On August 21, 1909, the master filed his report, and subsequently both parties filed exceptions, and the case is now before this court on these exceptions.

The issue in the case was a simple one. It concerned certain shares of stock received by the defendant, in addition to the cash rentals, under certain license contracts; and the only question in the case was whether this stock was rentals or royalties for licenses to use telephones within the true construction of the contract between the parties, dated November 10, 1879. If this stock was rentals or royalties for licenses to use telephones within the true construction of this contract, the plaintiffs were entitled to an accounting. If this stock was not rentals or royalties for licenses to use telephones within the true construction of this contract, the plaintiffs were not entitled to an accounting.

By the contract of November 10, 1879, the telephone patents were combined in the hands of the defendant. The first paragraph of this contract provided as follows:

"Article 1. (1) The party of the second part [the Bell Company] shall pay to the party of the first part [the Western Union], upon all telephones used in the United States, under any license from the party of the second part, express or implied, unless expressly excepted, a royalty or bonus of twenty per cent. of all rentals or royalties actually received or rated as paid in accordance with the provisions of this contract, from licenses or leases for speaking telephones (exclusive of call bells, batteries, wires, and other appliances, or services furnished or performed). The rentals or royalties upon which said royalty or bonus is to be paid to the party of the first part is to be reckoned shall, for that purpose, be ascertained by deducting from the gross rental or royalty received or rated as hereinafter declared, the commissions and allowances herein provided for."

Among the other provisions of the contract are the following:

"Article 2. Concerning the sum which is to be taken as the gross rental or royalty for the purposes of the preceding article, it is declared and agreed:

"(1) The word 'telephone,' as used in this contract, refers to an instrument for electrically transmitting or receiving articulate speech, and is understood to mean either a transmitting instrument, incapable of use as a receiver, a receiving instrument incapable of use as a transmitter, or an instrument capable of being used both as a transmitter and receiver.

"(2) Ten dollars per annum for each telephone where only one is used at a terminal or station, and fifteen dollars per annum for a pair of telephones composed of an instrument used for sending and another instrument used for receiving, used at one terminal or station, are recognized as the present standard rates of gross rentals or royalties; and the party of the second part may change them, subject to the qualifications of section (4) and (5) of this article, but not otherwise.

"(3) Telephones used on exchanges or lines owned in whole or part by the party of the second part, or by auxiliary corporations or organizations in which it is interested, or rented together with lines owned in whole or part by it, or by auxiliary corporations or organizations in which it is interested, shall be rated as paying to said second party the said recognized standard rates, or such other rates as may hereafter be established in accordance with this contract for like uses by parties other than the second party or auxiliary corporations or organizations in which it is interested, less the commissions and allowances provided for by this contract; but whenever the party of the second part is or shall be interested with others in the ownership of such exchanges or lines, the annual rental or royalty actually charged to and received from the owners thereof for the use of the telephones, if greater than the rates established as aforesaid, shall be taken to be the gross rental for the purpose of ascertaining the stipulated bonus or royalty.

"Article 3. (1) In ascertaining rentals on which the royalty or bonus is to be paid to the party of the first part, there shall be deducted from the gross rentals the following commissions and allowances:

"On telephones used in district or exchange systems owned in whole or in part by the second party, or by auxiliary corporations or organizations in which it is interested, an allowance or commission of thirty per cent.

"On telephones taken by the first party for private lines as hereinafter provided, or used by the second party on its own lines or out out by it, by its own officers or servants for any use other than on district or exchange systems in which it is interested as aforesaid, twenty-five per cent.; and the party of the first part or those it represents shall be allowed said abatement of twenty-five per cent. from the standard rentals upon telephones leased to it or them, except where contracts heretofore entered into by said party of the second part oblige it to pay such rate, or a higher rate of commissions to its present licensees.

"Upon all telephones other than the foregoing, such rate of commission as shall actually be paid, not to exceed forty per cent., except so far as existing contracts may call for higher rates."

"Article 12. (1) The right to all uses of the telephone on wires of a district or exchange system is to remain exclusively with the party of the second part, excepting such temporary suspension of the application of this contract to certain localities, as has been already herein provided for.

"Article 13. (1) The right to connect telephonic district or exchange systems for the purpose of personal conversation between persons at the instruments, and the right to use telephones on all lines not forming a part of a telephonic district or exchange system for such personal conversation (except so far as licenses for private lines are to be granted to the party of the first part under article 14), are to remain exclusively with the party of the second part, and those licensed by it for the purpose."

The position taken by the Western Union before the first master was that under the first paragraph of article 1 of the contract of No-

vember 10, 1879, this stock was rentals or royalties for licenses to use telephones, and, being such, that it was entitled to 20 per cent. of this stock, together with dividends and interest thereon.

The position taken by the Bell Company before the first master was that upon the true interpretation of the entire contract of November 10, 1879, this stock was not rentals or royalties for licenses to use telephones. This position was based upon two grounds: First, that under the contract rentals or royalties were limited to the standard annual cash rentals; second, that under the contract the Bell Company had the exclusive right to carry on the exchange business; that it could sell this right in the form of an exclusive perpetual license, and that the consideration for this stock was the sale of the exclusive right to the exchange business for different localities in the form of exclusive perpetual licenses.

The position which the Bell Company took as to the consideration for this stock is illustrated in the testimony of Mr. Forbes, president of the Bell Company:

"Int. 26. I will call your attention to the perpetual contracts which have been put in evidence, and upon which the Bell Company received from the persons and corporations who took them a certain amount of stock in those corporations, usually thirty-five per cent., without paying cash for it; and ask you to state the consideration which you at the time understood the Bell Company gave for that stock.

"Ans. We understood that the Bell Company had the right to conduct that business, subject to a certain royalty which we were, under the November 10th contract, obliged to share with the Western Union Company and its associates; we taking all the rest of the profits ourselves. That is to say, the profits of the business belonged to us and the right to take the business and conduct it, keeping all the profits. That belonged to us, and we sold out the right to take that business for a percentage of the stock, for which we paid no cash, and that that was the consideration for which we received the stock."

In defining the respective positions of the parties before him, the first master said:

"The plaintiffs maintain:

"(1) The shares, having been received in consideration of the grant of a license to use telephones, must be rentals or royalties from licenses or leases, within the terms of the contract, or a substitute evasive or otherwise for such rentals and royalties."

"The defendant contends:

"(1) That the contract contemplates uniformity in the royalties and rentals for each kind of license or class of telephones; that rentals and royalties in this connection mean the same thing, that is, rentals.

"(2) That the rentals and royalties which are to be accounted for are the sums mentioned in the contract as the standard annual rentals (less commissions) and nothing more, unless it should raise the rental for any class of telephones, as it has done in one instance.

"(3) That the telephone business is left absolutely in its hands, and that it has by express words the exclusive right to carry on the exchange business: and also the business of connecting exchanges, which implies the right to license others to carry it on; and it has the right to make such terms as it may be able to make with licensees, holding itself accountable to the plaintiffs only for the standard rentals.

"(4) That the shares in controversy were received in consideration of the defendant's consent not to carry on the exchange business and are in fact a mode of receiving its share in the profits of the business.

"(5) The defendant further strenuously maintains that, if any doubt exists as to the meaning of the contract, the master and the court should consider the previous course of business of the defendant so far as known to the plaintiffs, and the conversations and correspondence of the parties before the conclusion of the agreement, to explain its meaning, and that this evidence clearly shows the meaning of the contract to be such as they contend for."

The first master upon the pleadings and proofs ruled as follows: With respect to the way in which the Bell Company acquired this stock, he made the following finding of fact:

"The shares of which the plaintiffs require one-fifth to be accounted for were in nearly all cases obtained in the way to be presently mentioned, but reference may be had for their terms to the contracts reported herewith. The defendant issued to a corporation a license to use telephones for five years in an exchange to be established by and at the expense of the licensee in a certain place, paying the usual rentals, and reserved the right to take the plant at actual cost less depreciation at the end of the term, allowing nothing for franchise or good will. These short-term contracts either expired or were surrendered by the licensees, and thereupon the defendant gave them 'perpetual' exclusive licenses for the agreed locality, and received these shares, usually 35 per cent. of the entire capital stock, for which it paid nothing except the exclusive perpetual license."

With respect to the consideration which the Bell Company gave for this stock, he made the following finding:

"The defendant considered that it was selling its exclusive right to carry on the business, and that, in whatever way the value of this right was realized, it is the exclusive owner of it, and I so find."

The master further ruled as follows:

"It is clear that the exclusive right to do an exchange business was left with the defendant, and I cannot construe this as anything less than the right to the profits of the business; and this whether it carried on the business alone or jointly with others. It was known to the plaintiffs that the defendant, in November, 1879, owned exchanges in Boston and Chicago, and no claim was ever made until the letter of February 26, 1883, for a share in the profits of those exchanges, if that letter intends to include the profits of these exchanges which the defendant considers doubtful. No such claim appears to be made in the bill, nor was it made in the argument.

"I am of opinion that by the contract the defendant clearly had the exclusive right to carry on the exchange business, alone or jointly with others, and to receive its profits, paying to the plaintiffs 20 per cent. of the stated rentals. If this be granted, it may still be questioned whether when, in any case, the defendant decides not to carry on the business, but to license a corporation for the purpose, and when it agrees for a share of the profits without putting into the common stock anything but a license to use telephones, the profits may not be considered as rentals for the use of telephones. This point appears to me somewhat less clear than the other.

"The 'rentals and royalties' which are to be divided are certain annual sums which are definitely fixed in the contract with a certain latitude for increase or diminution.

"The contract, I think, contemplates a regular standard rental, substantially alike for each class of business, not to vary with the value of the use in particular cases, as the rental or royalty in which the plaintiffs are to share."

The master's conclusion that the plaintiffs were not entitled to the account asked for was based upon two rulings of law: First, that under the true construction of the contract of November 10, 1879, the

187 F.—28

defendant had the exclusive right to carry on the exchange business and to the profits derived from that business, and that the defendant could sell this right in the form of an exclusive perpetual license, paying to the plaintiffs only 20 per cent. of the stated cash rentals; second, that the words "rental or royalty" in the contract meant certain regular standard cash rentals. This construction of the contract the master found was also supported by the previous negotiations and correspondence between the parties.

It will be observed that the master sustained the contentions of the Bell Company as to the true construction of the contract of November 10, 1879.

The case then came before the Circuit Court on the exceptions of the Western Union to the master's rulings in matters of law; that is, to the master's rulings that under the contract of November 10, 1879, the Bell Company had the exclusive right to carry on the exchange business, which it could sell in the form of an exclusive perpetual license, and, second, that rentals or royalties in the contract meant the regular standard cash rentals.

The Circuit Court sustained the master's view upon these points, and dismissed the bill.

The plaintiffs then appealed to the Circuit Court of Appeals.

The record before that court presented the single issue whether this stock received by the Bell Company under its perpetual license contracts was rentals or royalties for licenses to use telephones within the true construction of the contract of November 10, 1879.

Upon this issue the record presented: First, the findings of fact by the master that nothing was given for this stock except the exclusive perpetual license, and that the consideration for this stock was the exclusive right to carry on the exchange business; second, the two rulings of law by the master that, upon the true construction of the contract of November 10, 1879, the Bell Company had the exclusive right to carry on the exchange business and to sell that right in the form of a perpetual license, and that rentals or royalties in the contract signified the annual standard cash rentals; and, third, the finding by the master that his construction of the contract between the parties was supported by previous negotiations and correspondence.

The Circuit Court of Appeals took the record which was before it, and decided the case upon that record. It considered the single issue presented by the record, namely, whether this stock was rentals or royalties for licenses to use telephones. It adopted the finding of fact by the first master that nothing was paid for this stock except the exclusive perpetual license. It disagreed with the first master and with the Circuit Court as to the true construction of the contract of November 10, 1879. The first master and the Circuit Court held that, under the true construction of the contract, rentals or royalties were limited to the standard annual cash rentals. The Circuit Court of Appeals held that, under the true construction of the contract, rentals or royalties were not limited to the annual cash rentals, and included this stock as well as cash. The first master and the Circuit Court held that, under the true construction of the contract, the defendant had

the exclusive right to carry on the exchange business, which it could sell in the form of an exclusive perpetual license. The Circuit Court of Appeals held that, under the true construction of the contract, the plaintiff had no such exclusive right to carry on the exchange business, and to sell that right in the form of an exclusive perpetual license. The first master and the Circuit Court held that the prior negotiations, correspondence, and earlier contracts confirmed their construction of the contract of November 10, 1879. The Circuit Court of Appeals held otherwise. The first master decided that the plaintiffs were not entitled to any accounting with respect to this stock; and the Circuit Court confirmed the master's report, and entered a decree dismissing the bill. The Circuit Court of Appeals reversed the decree of the Circuit Court, and directed that court to enter a decree for an accounting, and for further proceedings in accordance with its opinion. It would seem necessarily to follow from these conclusions of the Circuit Court of Appeals that this stock was rentals or royalties for licenses to use telephones under the contract of November 10, 1879, and to be accounted for under that contract, except so far as the court in its opinion may have excepted certain things from the accounting.

Since, however, the counsel in the case differ so widely as to the meaning, scope, and effect of the opinion of the Circuit Court of Appeals, a full examination of the opinion seems to be required.

After a statement of the parties to the case, and that the bill was brought for an accounting under a contract dated November 10, 1879, the opinion says:

"Without waiting for a hearing, on May 24, 1886, the case was sent to a so-called master under the following agreement:

"'It is agreed that the above-named cause may be referred to the Honorable John Lowell, as master, to hear the parties, report the facts, with such part of the testimony as either party shall request, and his rulings on any question of law arising in the case.' * * *

"The complainants excepted to the master's report solely as to questions of law. The respondent took no exceptions. * * *

"The master found for the respondent, and the Circuit Court sustained his findings, and entered a decree dismissing the bill. We think that we should first make clear what the true issue is. The contract obligated the telephone company, among other things, to account to the Western Union for a certain percentage of rentals or royalties for the use of telephones protected by certain letters patent. * * * Then the telephone company not only owned and licensed telephones, but, also, had certain interests in exchange systems. The master, among other things, reported:

"'I am of opinion that by the contract the defendant clearly had the exclusive right to carry on the exchange business, alone or jointly with others, and to receive its profits, paying to the plaintiffs 20 per cent. of the stated rentals.'

"It is clear that the Western Union had, under the contract, no interest in the exchange business which the telephone company owned, in whole or in part, or in the profits received therefrom, so far as either can be distinguished from considerations for the mere licensing of telephones, or so far as the advantages which came from them to the telephone company, came as the result of a contribution by it aside from that of such mere licensing. It is, also, clear that when, even after the contract of November 10, 1879, the telephone company had properly acquired any part of an exchange, the complainants had no interest in the subsequent profits which might come therefrom. The position of the complainants before us renders it unnecessary to elaborate these propositions. They put the case on a single issue in

the following language, which refers to certain shares of corporate stock which the complainants maintain the telephone company received as part consideration for licenses to rent and use telephones:

"'It is in respect to these shares thus received by the Bell solely for exclusive licenses to use telephone instruments under the patents which were by the contract combined in its hands, and by virtue of which contract alone the Bell was able to give such licenses, that this suit seeks an accounting.'

"This claims is illustrated by the following finding by the master:

"'The shares, of which the plaintiffs require one-fifth to be accounted for, were, in nearly all cases, obtained in the way to be presently mentioned; but reference may be had for their terms to the contracts reported herewith. The defendant issued to a corporation a license to use telephones for five years in an exchange to be established by and at the expense of the licensee in a certain place, paying the usual rentals, and reserved the right to take the plant at actual cost less depreciation at the end of the term, allowing nothing for franchise or good will. These short-term contracts either expired or were surrendered by the licensees, and thereupon the defendant gave them perpetual exclusive licenses for the agreed locality, and received these shares, usually 35 per cent. of the entire capital stock, for which it paid nothing except the exclusive perpetual license.'"

Up to this point the opinion has stated: First, that the suit was brought for an accounting under the contract of November 10, 1879; second, that it was referred to a master; third, that the plaintiffs took exceptions to the master's report only in matters of law, while the defendant took no exceptions; fourth, that the plaintiffs had no interest under the contract in the exchange business or the profits derived therefrom, which the defendant owned in whole or in part, so far as either can be distinguished from the mere licensing of telephones; fifth, the issue in the case; sixth, the finding by the master that the defendant gave nothing for this stock except the exclusive perpetual license.

In other parts of the opinion the single issue in the case is again defined as follows:

"It is plain that the only question before us is whether the Western Union may share in valuable assets received in lump by the telephone company in exchange in the whole or in part for telephone licenses.

"The case as put is one of the receipt by the telephone company of certain shares of capital stock, in addition to the annual rentals for which it has accounted to the Western Union.

"The case stands, therefore, on the propositions of law and equity which we have already stated; that is to say, that the telephone company has received certain assets in addition to rentals by name, which it must account for under the first paragraph of article 1, unless the contract elsewhere clearly permits otherwise.

"We find nothing in the case which raises any practical issue except the specific matter which we have discussed, and that we find to be limited to certain shares of stock alleged to have been received by the telephone company. We therefore determine that the only issue is the ascertainment as to certain shares of stock received by the telephone company since November 1, 1879, in consideration, in whole or in part, for licenses to use telephones, and as to the incidentals appurtenant thereto."

Taking up the contract of November 10, 1879, the opinion says:

"It is not necessary to set out with great fullness the contract in issue. It has been abstracted in the opinion of the learned judge who heard the case in the Circuit Court, and a general statement of its purview with reference to the topics which bear on the question at bar will be sufficient.

The respondent has very well stated its general features in substantially the following language: The Western Union, a well-established corporation with a large capital, controlling continental telegraphing, was, also, previous to and at the time the contract was made, carrying on a more or less extensive telephone business. The telephone company, then a comparatively new and small corporation, was wholly engaged in telephones, and, by virtue of its patents, claimed an exclusive right. Numerous suits were pending for a determination of the respective rights under the several telephonic patents owned or controlled by the parties. The Western Union desired to protect its telegraphic business against possible inroads by telephones. And, under those circumstances, a compromise was reached, and this contract was executed. Its principal features are carefully framed provisions for the protection of the Western Union telegraphic system, and a lease and transfer by it to the telephone company of its interests in the telephonic patents, its telephones and telephonic exchanges, with an agreement that the Western Union should receive a certain proportion of the rentals or royalties which should come to the telephone company."

In considering the construction and effect of the contract, the opinion says that it created relations between the parties of a fiduciary character:

"In contemplating the construction and effect of the contract we must first of all consider that the relations of the parties to it were of the fiduciary character to which we have referred; so that the telephone company, as the sole holder of the joint interests, left in exclusive control thereof, was bound to the underlying rule that, neither directly nor indirectly, nor by any artifice whatever, should the Western Union be deprived of its share in the net profits of the licenses, or leases, whatever form they might assume, unless and except as expressly so provided."

"It is also true that, other than with a technical trustee, this contract left a large discretion with the telephone company, and did not bind it to any particular rule of diligence or skill. Nevertheless, this general equity requires it to account with the utmost good faith for what concerns the common interests. This equity is effectual, universal, and unyielding, and we must approach the contract in the light of it, and give the Western Union the full benefit thereof."

Again, on this point the court says:

"Like the other equitable rule to which we have referred, this one is also efficient, far-reaching, and absolute; so that, beyond all question, in view of the equitable obligations resting on the telephone company which we have described, and even under the rules of the common law, contracts of this character must be so construed and applied that the portions of the present contract which we have cited compel the telephone company to account for the shares of stock for which the accounting is asked, under the circumstances stated by the master, precisely as it would be required to account for any gross addition to rentals which it might have received in the form of a sum of money, unless something can be found in the contract which shows that the parties have stipulated otherwise. The underlying equities which we have described are so strong that they are not lightly to be set aside, nor can they be ignored on account of mere inferences ingeniously drawn from circumstances, or from anything except what appears clearly on the face of the contract or what is clearly inconsistent with the operation of its provisions."

The court then proceeds to a discussion of the provisions of the contract, and particularly of the first paragraph of article 1:

"The contract in suit took effect as of November 1, 1879, and ran for 17 years. It covered the whole United States, with sundry exceptions which need not be named here. The Western Union and corporations it represented

are described in it as the party of the first part, and the telephone company as the party of the second part. The contract opens with a requirement that the telephone company pay to the Western Union 'upon all telephones used in the United States under any license' from the telephone company, 'unless expressly excepted, a royalty or bonus of 20 per cent. of all rentals or royalties actually received or rated as paid, in accordance with the provisions of the contract, from licenses or leases for speaking telephones.' Article 1, par. 1. It then provides for a deduction of certain allowances, which does not trouble us. It then proceeds as follows:

" 'Concerning the sum which is to be taken as the gross rental or royalty for the purpose of the preceding article, it is declared and agreed' 'that ten dollars per annum for each telephone, where only one is used at a terminal or station, and fifteen dollars per annum for a pair of telephones composed of an instrument used for sending and another instrument used for receiving, used at one terminal or station, are recognized as the present standard rates of gross rentals or royalties.'

"The contract provides that the telephone company may raise the rentals or royalties without conference with the Western Union; but it prohibits the lowering of them without its consent, except as the result of an arbitration, the details of which we have no occasion to explain. It should be said in this connection that the contract makes special provision for telephones which might be exported and sold abroad. but that, aside from this, the uniform practice of both parties to the contract, if not their universal practice, was, and had been, not to sell telephones, but to lease for annual rentals. The master reported that 'the rentals had come to be nearly uniform in the different classes of business at about the rates mentioned in the contract.' It appears, however, by the answer that the rentals and royalties named in the contract had ever since been the same, with the exception that the price for a pair of telephones had been raised to $20. We do not find that there is any dispute arising out of this fact; but we speak of it because it illustrates a proposition as to which there should be no question made before us. There is no pretense whatever for any claim to the effect that the word 'rated,' or the word 'standard,' or any other word or expression in the contract, established a fixed license fee, so far as the relations between the parties to this litigation are concerned. Numerous paragraphs, some of which we will refer to hereafter, expressly provide for increasing the rates, and for the Western Union sharing in such increase. The word 'standard' could hardly be justly construed as leading in any other direction; and. if it could be. the context would show that it was merely an unfortunately chosen word, overruled by various other portions of the contract.

"Every word contained in the following expression in the first paragraph of article 1, namely, 'all rentals or royalties actually received or rated as paid,' etc., can have, and should have, its full effect. The words 'actually received' relate to whatever may come in hand, whether on the basis of the 'present standard rates,' or from licenses for which more than the 'present standard rates' might be paid. Therefore it is useless to contend that the contract contemplated any fixed sum as a maximum which the Western Union must be content with; while, on the other hand. the expression which we have just cited from the first paragraph of article 1 was entirely in its interest, giving it the minimum named license rate, even if the telephone company sold licenses below that rate, except as provided in the contract, and. also, giving it the benefit of all rentals or royalties received in excess of that rate, whatever the excess might be."

In discussing the meaning of the words "rentals or royalties," the court says:

"On the whole, this expression in the first paragraph of article 1, 'all rentals or royalties actually received or rated as paid,' is, on any method of construction, whether literal or otherwise, flexible, and favorable to the complainant; but, after all, the fundamental rules of construction which we have said apply to this contract, cut under this refined discussion as to the literal meaning of particular words and phraseology. * * * The

case in this respect stands exactly the same as though the telephone company had received the equivalent of these shares in money, or had immediately converted them into money. For all present purposes the transaction is to be scrutinized in the light of the fact that all questions as to the nature of the assets received are immaterial."

The court continues:

"The respondent's case is built up on inferences, and it therefore rests upon it to show that these inferences so work into the body of the contract as to render it inconsistent with the application of the positive equities which we have said underlie instruments of this character. One proposition urged upon us is that, in this long contract, carefully framed between parties who were competent to provide for contingencies of the character we are considering, the constant use of the words 'rentals' and 'royalties,' and the references to annual rates, must be accepted as a positive exclusion of any other benefit to come to the Western Union. But the mere fact of numerous repetitions, especially in long contracts, does not prove that they are not vain. * * *

"Even if a literal interpretation, on the rules insisted on by the respondent, be given effect, it would easily be met by a deduction from what we have already said as to the meaning of the word 'rentals,' or 'annual rentals.' That which can be made certain is certain; and, whatever form remuneration takes, if it can be reduced mathematically to a rental, or annual rental, it is sufficient for even the most literal rules of construction. If, for example, in lieu of the 'ten dollars per annum,' named in paragraph 2 of article 1, the telephone company received, either in shares of stock or money, $100 for a 10 years' license, which seems to have been commonly granted, or $170 for a perpetual license, which would mean the entire 17 years for which the contract ran, either hypothesis readily computes an annual rental of $10; and, if received in advance, it must likewise be accounted for in advance.

"But, from what we have already said, it follows that all this is a mere play on words. The course of business at the time the contract was made leads to the just conclusion that the parties thereto were not contemplating the taking of lump sums as a consideration for licensing telephones for the period of the contract or the larger portion thereof; but, if the respondent did this, and thus departed from the specific mode of doing business then customary, it nevertheless remained justly chargeable under a true construction of the broad provisions of paragraph 1 of article 1."

With respect to prior contracts, and correspondence between the parties, in their bearing on the construction of the contract of November 10, 1879, the court makes the following observation:

"On the whole, the contract before us exhibits on its face sufficiently for present purposes the existing condition of things; and, aside from what is disclosed by it and things of common knowledge, the matters which have been so elaborately pressed upon us cannot safely be permitted to change the just construction of what we find in the instrument itself. So far as it goes, it is reasonably clear; and its application to any conditions, which its terms do not in fact anticipate, must be determined by the fundamental rules of law which we have already explained."

The court then discusses what it terms the "defendant's leading proposition," which relates to its exclusive right under the contract to carry on the exchange business and to sell that business to others in the form of a perpetual license:

"The leading proposition of the respondent is based on one of the master's findings, which must be accepted as a finding of law, and has weight only accordingly. After stating, as we have already said, as a matter of fact, that nothing was paid for these shares of capital stock except an 'exclusive, perpetual license,' he states, at another point, as follows:

" 'The defendant considered it was selling its exclusive right to carry on

the business, and that, in whatever way the value of this right was realized, it is the exclusive owner of it; and I so find.'

"This proposition is made by the telephone company the burden of its case. This word 'exclusive' is deduced from paragraph 1 of article 12 of the contract, and paragraph 1 of article 13, in each of which the word 'exclusively' appears, as will be shown by the following transcripts thereof:

" 'The right to all uses of the telephone on wires of a district or exchange system is to remain exclusively with the party of the second part, excepting such temporary suspension of the application of this contract to certain localities as has been already herein provided for.

" 'The right to connect telephonic district or exchange systems for the purpose of personal conversation between persons at the instruments, and the right to use telephones on all lines not forming a part of a telephonic district or exchange system for such personal conversation (except so far as licenses for private lines are to be granted to the party of the first part under article 14), are to remain exclusively with the party of the second part, and those licensed by it for the purpose.'

"The respondent says that, for success, the licensees of the exchanges required not only telephones, but a monopoly; 'they,' the licensees, 'needed the exclusive right to do business in the district.' And it adds: 'This monopoly which the licensees wanted to buy the defendant had for sale; and the defendant sold it to the licensees for a share of their capital stock.' The respondent reiterates that the telephone company's contracts of leases, by virtue of which it received sundry shares of stock, conveyed much more than the right to use telephones, because each transaction was an outright sale of its monopoly of the exchange business for the locality concerned.

"Thus the respondent rests its case mainly on the word 'exclusively,' found in the extracts we have made from articles 12 and 13. But it is clear that, for the purposes of this case, this word has no legal force. * * *

"Although the telephone company had certain exclusive rights under the contract, as between it and the Western Union, any exclusive rights which it granted to its licensees were not the same, but they merely sprung out of them; because it was entirely at the option of the telephone company to grant licenses which contained no feature of exclusiveness. The fundamental and controlling proprosition, however, is a simple one. The relations were so complicated that almost every provision of the contract in suit, if not every one, is subject to certain incidental exceptions; but, aside from that, the telephone company held under it a right to issue licenses exclusively for exchange uses independently of any terminology to that effect, precisely as it had a right to grant licenses exclusively for private lines, or for speaking tubes, or for any other special class of uses. So that, so far as this case is concerned, it may well be said, without any limitation, that the telephone company, from the mere force of the contract, as construed by the law, might grant exclusive rights with reference to every use to which the telephone could be put. It was in the power of the telephone company to contract with a corporation in Boston to grant it an exclusive license for that city, for a term of years, or perpetually, subject to certain inevitable exceptions, for all speaking-tube purposes, or a like exclusive license for all private lines. With reference to each of the same, the telephone company acquired exclusively the same monopoly that it did as to telephonic exchanges; but the respondent rests its case on this verbal distinction, and, inasmuch as the distinction is entirely immaterial in this connection, its case falls through."

The court then proceeds to account for the use of the word "exclusively" by a reference to and discussion of other provisions of the contract.

In closing the court refers to what is excluded from the accounting, to the practice governing the accounting, and to other kindred matters:

"We exclude from the accounting anything received by the telephone company in any form which was properly the equivalent of what it possessed

the day as of which the contract went into effect; that is, November 1, 1879. As, for example, so far as at that time the telephone company had given any license, if there were any such, involved in any contract entitling it at the end of a specific period to receive a surrender of the whole or any part of the plant or other incidents of a telephonic exchange, and so far as subsequent to November 1, 1879, the telephone company surrendered such option and gave a new license, receiving an obligation for the usual rentals or royalties, and certain shares of corporate stock, such portion of such corporate stock as represented the value of the option surrendered pertains to the telephone company, and is not to be accounted for. It may, and probably will, be difficult to make this apportionment; nevertheless, if there are any conditions existing as we have stated, the apportionment must be made as can be best done. In this connection, we repeat that we do not intend hereby to conclude or preclude any questions with reference to dividends or interest, and all such questions are reserved, so far as we are concerned, until the case comes to us again from the Circuit Court, if it ever does.

"Of course, the accounting, according to settled practice in equity, will be brought down to as late a period as is practical; and, all parties having already had full opportunity of bringing into the record all facts essential to the final accounting, each must, on such accounting, be confined to the present record except so far as equity shall require otherwise.

"In view of the state of the record thus spoken of, it is probable that we could proceed further, and dispose considerably of the issues involved in the accounting; but the proper practice is that pointed out in Chicago, Milwaukee & St. Paul Railway v. Tompkins, 176 U. S. 167, 179 [20 Sup. Ct. 336, 44 L. Ed. 417]. In the form in which this case comes to us—that is, on a general finding against the complainants—it might be impracticable for us to go further into details without doing injustice. However, we are entitled to avail ourselves of the relief which comes from the rule stated in the case just cited."

This opinion may be summarized as follows:

The court finds the relation of the parties under the contract of November 10, 1879, to be of a fiduciary character. This is fundamental, and lies at the basis of the opinion.

It finds that the subject-matter of the contract was telephone patents, which were combined in the hands of the Bell Company and subject to its control.

It finds that, under these circumstances, the Bell Company should not be permitted by any change in its methods of carrying on the telephone business, or of realizing the profits of that business, to deprive the Western Union of its just share of the proceeds under the fundamental covenant of the first paragraph of article 1 of the contract.

It finds that the only issue in the case relates to certain shares of stock received by the Bell Company for licenses to use telephones.

It finds, by adopting the first master's finding, that nothing was paid for this stock except the exclusive perpetual licenses.

It finds that this stock comes within the broad terms of the first paragraph of article 1 of the contract of November 10, 1879, unless it should be found that these terms are limited by the other provisions of the contract.

It finds that, upon the true construction of the other provisions of the contract, the broad terms of article 1 are not so limited as to exclude this stock from the accounting required by that article.

It finds that the contract does not limit "rentals or royalties" to any fixed sum in money, and that they include this stock as well as money.

It finds that the word "exclusively" in the first paragraph of article 12 and the first paragraph of article 13 of the contract does not confer upon the Bell Company such an exclusive right to carry on the exchange business and the extraterritorial business that it may sell this monopoly in the form of a permanent license to use telephones, and not account to the Western Union for stock received in consideration of such a license.

While conceding the right of the Bell Company to carry on the exchange business or the extraterritorial business, in whole or in part, and receive the profits thereof, it holds that, under the broad terms of article 1 of the contract, the Western Union is entitled to share in any money or stock which the Bell Company has received as a consideration for the grant of any license to use telephones.

It finds that there should be excluded from the accounting anything received by the Bell Company in any form which was properly the equivalent of what it possessed on November 1, 1879, the day the contract went into effect; and cites, as an example, the value of the option to take over the plant of the licensee company which it possessed under the short-term licenses, and which it surrendered under the permanent licenses.

In a word, the Circuit Court of Appeals decided the single issue raised by the bill in favor of the Western Union; that is, it decided that the stock received by the Bell Company for perpetual licenses to use telephones was rentals or royalties for licenses to use telephones within the meaning of the first paragraph of article 1 of the contract of November 10, 1879, and therefore subject to the accounting under that paragraph. At the same time the court excluded from the accounting anything received by the Bell Company which was properly the equivalent of what it possessed on November 1, 1879, the day the contract went into effect.

Under the decree and opinion of the Circuit Court of Appeals, the master has found that the plaintiffs were entitled to 20,087.8257 shares of stock and $2,579,914.64 in cash. The master excluded from the accounting the stock (and dividends) received by the defendant under four of these license contracts. These license contracts contained special features which brought them, in the opinion of the master, within the exemption laid down in the opinion of the Circuit Court of Appeals.

Since the plaintiffs' exceptions are mainly confined to the rulings of the master excluding the stock in these four particular cases, we will first consider the defendant's exceptions, which raise questions of a more fundamental character.

The defendant bases its exceptions to the master's rulings largely upon two main propositions:

(1) The rentals and royalties to be accounted for under the contract of November 10, 1879, are limited to the sum paid by the telephone user to the licensee company, and do not include the sum paid by the licensee company to the defendant. If this proposition is sound, it follows that this stock is not rentals or royalties and is not subject to any accounting, since it was received by the defendant from its licensee

companies and not by the licensee companies from their telephone subscribers.

(2) If this stock is rentals and royalties, then only such portion of the stock is subject to the accounting as may be attributed to the right to use telephones, and the defendant is entitled to show, under the decision of the Circuit Court of Appeals, the various other considerations for the stock, both within the terms of the license contracts and outside of the license contracts.

We will consider these propositions in their order:

I. The defendant requested the master to rule:

"That the rentals and royalties to be accounted for are confined to those portions of the rentals and royalties received by the licensees of the defendant from their subscribers which were required by the license contracts issued by the Bell Company to be paid over to it."

The master declined this request and ruled:

"That the contract of November 10, 1879, applied and was intended to apply to all rentals or royalties for telephones paid by the licensee companies to the Bell Company, and was not confined to those paid by the telephone users to such licensees; that, while the contract did not specify any but money rentals, it did not in terms confine the plaintiffs' rights to such rentals, but applied in general terms to 'all rentals or royalties actually received' by the Bell Company, as well as to those which should be 'rated' or conclusively presumed to be received by it, whether in fact received or not. In short, that the contract provided for a share of the Bell Company's total net receipts in the form of rentals or royalties from licenses or leases for speaking telephones, or. as stated by the Circuit Court of Appeals, a 'share in the net profits of the licenses or leases' for speaking telephones."

This ruling of the master was clearly right, since it was in accordance with the opinion of the Circuit Court of Appeals. It may be said that, if anything was determined by the Circuit Court of Appeals, it was that this stock, in whole or in part, was rentals or royalties for licenses to use telephones. That was the only issue in the case.

The defendant insists, however, notwithstanding the decision of the Circuit Court of Appeals, that it is necessary, as a starting point in this accounting, first to define the meaning of rental in the contract of November 10, 1879, and then to follow that definition to its logical conclusion.

It further insists that rental means the sum paid by the telephone user to the licensee company, and that the adoption of this meaning makes the construction of all these contracts clear, intelligible, and simple.

The difficulty with this whole line of argument, which permeates the defendant's able and elaborate brief, is that it is based upon the assumption that the Circuit Court of Appeals has not decided this fundamental question. In view of that decision, however, it may be said that we are not now concerned with any theory of rental, and that the question whether rental means the sum paid by the telephone user to the licensee company or the sum paid by the licensee company to the Bell Company is not open upon this accounting.

An examination of the record shows that this question of the meaning of rental in the contract of November 10, 1879, is the same ques-

tion which was passed upon by the first master, the Circuit Court, and the Circuit Court of Appeals.

The two defenses to this suit upon which the defendant relied were as follows:

(1) This stock is not rental within the meaning of the contract between the parties.

(2) This stock represents the sale of the exchange business to various licensee companies. This business belonged to the defendant under the contract between the parties, and it had the right to sell this business in the form of a permanent license.

Both of these questions were decided in favor of the defendant by the first master and the Circuit Court, and both of these questions were decided against the defendant by the Circuit Court of Appeals.

The first master specifically found that, upon the true construction of the contract between the parties, "rental" means the standard annual cash rental, and the Circuit Court affirmed this ruling. The Circuit Court of Appeals specifically held that upon the true construction of the contract between the parties rental was not so limited, and included this stock for which the plaintiffs asked an accounting.

Before the first master, the Circuit Court, and the Circuit Court of Appeals, the defendant said that rental means the standard cash rental. The defendant now says that rental means the standard cash rental paid by the subscriber. I can see no substantial difference in these statements. This whole argument of the defendant as to the meaning of rental or the true theory of rental in the contract of November 10, 1879, is only an elaboration and extension of the argument which convinced the first master and the Circuit Court, and which was disapproved by the Circuit Court of Appeals.

II. We come now to the defendant's second proposition—the considerations which were given for this stock.

Upon this point the master states the defendant's general position as follows:

"Defendant claimed that the stocks received by it are not to be attributed solely to the right or license to use telephones, but to various considerations, both within and outside the terms of the license contracts. Its claim to that effect was set up in its discharge as follows:

" '(3) The stocks and money claimed by the plaintiffs in said charge were received by the defendant in return for property, options, and other rights possessed by the defendant on November 1, 1879, or for considerations other than the licensing of telephones.' "

Upon this point the master excluded the evidence of considerations outside the terms of the license contracts, and with respect to the license contracts he ruled as follows:

"But I ruled, upon examination of the contracts and accompanying licenses, all of which were in evidence before me, that, while they related to a diversity of circumstances and involved different details and different cases, in substance they granted only the right to use and rent telephones, as set forth in the annexed license agreements."

Stated more fully: The defendant contended that under the decision of the Circuit Court of Appeals the recovery by the plaintiffs under article 1 of the contract of November 10, 1879, was limited to such

portion of this stock as may be attributed to the right or license to use telephones, and that the defendant was entitled to show various other considerations for this stock both within and outside the terms of the license contracts.   Among these other considerations the defendant claimed the following:

(1) Value of connection with the Bell system.
(2) Value of right to use subsidiary apparatus.
(3) Value of right to carry on extraterritorial business.
(4) Value of surrender of options.

The master limited his inquiry into this subject of consideration to the license contracts themselves, and excluded the defendant's testimony as to the value of considerations outside these contracts; that is, the value of considerations involved in the licensee's connection "with the great Bell organization, protection against patent suits and infringements, financial assistance, the services of its great engineering and electrical talent, the connection with its extraterritorial lines, and the whole extraterritorial business."

Before taking up the specific rulings of the master on this question of consideration, we will refer to some general observations which have a bearing on the question.

At the hearing before the first master upon the question of the considerations which were given for this stock, the defendant does not appear to have attached any importance to the considerations which are now relied upon, such as the value of the connection with the defendant's system, the value of the right to use subsidiary apparatus, the value of the right to carry on the extraterritorial business, and the value of the options.

The defendant's position before the first master on this question was as follows:

"The shares in controversy were received in consideration of the defendant's consent not to carry on the exchange business, and are in fact a mode of receiving its share in the profits of the business."

In fact, before the first master there was no dispute as to the consideration for the stock; and the first master accordingly found as follows:

"The defendant considered that it was selling its exclusive right to carry on the business, and that, in whatever way the value of this right was realized, it is the exclusive owner of it, and I so find."

The first master further found that nothing was paid for this stock except the exclusive perpetual license, and the Circuit Court of Appeals adopted this finding.   The first master also refers to these licenses as agreements by the Bell Company to share in the profits of its licensees "without putting into the common stock anything but a license to use telephones."

On this question of consideration the position of the defendant before the first master, the Circuit Court, and the Circuit Court of Appeals was this:

The consideration for this stock was the sale of the exchange business, which the defendant believed it was entitled to under the con-

tract of November 10, 1879, and the means or instrument by which the sale was effected was a permanent license to use and rent telephones.

This position is supported by the circumstances under which these permanent licenses were issued.

The defendant had issued a short-term license, usually five years, with the right to take the plant at cost on its termination. At the termination of this license the defendant could adopt one of two courses: It could take over the plant and carry on the exchange business itself, in which case it would be entitled to all the profits of the business, subject to the payment of the standard cash rentals for telephone instruments; or it could sell the right to carry on the business. It chose the latter arrangement; and, in consideration of the permanent license, it received one-third of the stock of the licensee company.

There was no substantial difference between the short-term license and the permanent license except this element of perpetuity. All those things which the defendant now claims were considerations of value in the permanent license other than the right to use telephones entered into and formed a part of the short-term license; and yet in the case of the short-term license the defendant received nothing for these considerations. If stock had been received under a short-term license, I do not see why the defendant could not have argued with almost equal force that the right to use telephones was only one of many considerations both within and outside the license contract, which moved from the defendant to the licensee company.

The defendant's counsel say in their brief at the present hearing that there is no substantial difference between the short-term license and the permanent license except this element of perpetuity:

"There was no substantial difference between the provisions of the short-term licenses and the permanent licenses, except that the former were limited in duration and the latter were perpetual, and that the net cash rental paid by the operating company was, in some cases, increased. The option hereinafter referred to was reserved in each form of license: but in the short-term license was, of course, available upon the termination of the license as well as in case of forfeiture, and in the perpetual license was, naturally, available only in the case of forfeiture."

Again, in speaking of the defendant's revenue, the brief says:

"The Bell's receipts, under its contracts and licenses, were in three forms: (1) Annual cash payments of so much per telephone; (2) annual cash payments of a percentage of extraterritorial tolls; (3) a stock payment made when the permanent contract was made."

This indicates that the stock was received in consideration of a permanent license as distinguished from a short-term license.

Mr. Fish, counsel for the defendant, admits that the licensee companies were given the same advantages under the short-term licenses as under the permanent licenses, without consideration; in other words, that the only difference between the two forms of license was the permanency of the arrangement. Mr. Fish says:

"Each one of these short-term contracts contains the standard provision for the payment of standard telephone royalties. There is no question about

that. When the people made those contracts, they got a license on standard terms and the support and co-operation of the parent company for this short term, this trial period, at the end of which time they lost everything (except that their investment was protected) unless they had made good, so that the parent company was willing to make with them a permanent arrangement. They did, in almost every case, make those permanent arrangements, thus covering the whole country, and in making those permanent arrangements—

"Colt, J.: They got the accessories, didn't they? They got the call bells?

"Mr. Fish: During the short term, yes, your honor, they got the call bells, and they got other rights, but they got them all simply in a tentative fashion while the business was being built up and they were being tried out. When the end of five years came, what happened? The telephone company said to those men: 'You have made good, and now we want to talk with you about a permanent relation.'

"Mr. Benton: They paid for all these things on the short-term contracts, Mr. Fish. They paid for everything they got.

"Mr. Fish: Paid cash?

"Mr. Benton: I understand, but they paid.

"Mr. Fish: Paid cash for the apparatus, you mean?

"Mr. Benton: You were putting it as though they were given things.

"Mr. Fish: They were given things, no question about that.

"Mr. Benton: What?

"Mr. Fish: They were given all these things that the company had to give. They were given the right to get all the apparatus and at standard rates; they were given the other things that are named in the contract; and they were given the help of the telephone company during all this time. They were given everything that the Bell Company had for this short-term because they were trying them out.

"When it comes to the question of the permanent arrangement, let us see what the attitude of the local people was. It is clear, if you study this situation, what it was. The telephone company said: 'Now, at the end of that contract we can take that business and have it for all time without paying you a cent except the cost of this plant'—just your investment. 'Now we don't want to do that; we want you with us. We will make a permanent arrangement with you, instead of taking your plant away and doing the business and taking all the profits ourselves. You will continue to receive license fees and royalties for the use of the telephones as has been done under the short-term contract, and we will take a percentage of your stock to represent our share of the profits of the business; all of which we might take by exercising our rights under the short-term contract and doing the business ourselves, if we chose.'"

These facts and circumstances, in my opinion, have a distinct bearing on the question whether the defendant received this stock for considerations other than the perpetual right to use and rent telephones.

Coming now to the specific rulings of the master on this subject of consideration, we find that they may be conveniently considered under two heads, and in the following order: (1) The considerations within the terms of the license contracts; and (2) the considerations outside the license contracts.

1. As to the considerations within the terms of the license contracts the master ruled as follows:

"That the contracts and licenses, taken together, showed that their whole scheme and purpose was to grant the right to use and rent telephones, upon the terms and conditions named in the contracts, and subject to the restrictions and limitations set out in the licenses; that everything else contained in the licenses was incidental and subsidiary to that main grant; and that the licenses were strictly and in the full sense 'licenses or leases for speaking telephones, exclusive of call bells, batteries, wires, and other appliances, or services furnished or performed,' and essentially nothing else, and thus with-

in the terms of the first paragraph of the contract of November 10, 1879, except that in the connecting line or extraterritorial licenses there were two considerations expressly reserved to the licensor, namely, the rental and royalty for telephones, and 'in addition to said telephone rental and royalty, and in consideration of the further rights and privileges hereby granted, one-fourth of the lessee's gross receipts from subscriptions and tolls'; the further rights and privileges referred to being the right to construct and use connecting lines between exchanges."

With respect to the considerations for the grant of these licenses, which are expressed in the license contracts themselves, the master found as follows:

"In almost all cases several license forms were annexed to the contracts, though in a few cases the contracts embodied the license, and in a few other cases nothing but license forms were used. The contracts usually recited that the lessee held certain licenses issued by the lessor, or had acquired the business and licenses of certain lessees of the lessor, and desired to surrender such existing licenses and obtain the permanent licenses annexed in their stead. It was agreed that the licensee should surrender and the licensor should accept the surrender of the former licenses, and that the licensor should thereupon execute and deliver to the licensee new licenses for exchange purposes, extraterritorial lines, and private lines, in the forms annexed to the contract. In some cases it was then provided that 'in consideration of the grant of said licenses' or 'in consideration of the grant of the right to use and rent telephones as in said several agreements hereto annexed set forth, and in addition to the rentals, royalties and other payments therein provided for,' and 'in payment (or part payment) for the grant of said licenses,' but most frequently 'in consideration of the premises,' the licensee should, upon the execution of the license contracts, issue to the Bell Company certain portions of its existing capital stock, with a provision for the issue of a like proportion of any future increases thereof without further payment or consideration. Others of the contracts, but the smaller portion of them, had special features, and the considerations were variously expressed, but the above were the typical statements of the considerations."

It thus appears that the consideration named in some of these contracts was expressly stated in the following language: "In consideration of the grant of the right to use and rent telephones." In reference to this the master says:

"That the literal construction of some of these statements of the consideration of the contracts was against the defendant's contention was recognized by its counsel; but it was contended that all the provisions of the contracts and licenses taken together showed that they involved many other considerations than the mere licensing of telephones, and that the stock was taken 'for a consideration entirely other than the telephone instrument itself.' "

[1] Notwithstanding this specific language in some of the license contracts, the defendant claimed that there appeared in the licenses that there were other considerations given for this stock than the right to use and rent telephones.

One of these important considerations was the right to use subsidiary apparatus.

With respect to this claim the master said:

"The defendant claimed, as above stated, that one of the considerations for the stock, other than the right to use and rent telephones, appearing in the licenses themselves, was the right to use and rent call bells, switchboards, and other subsidiary apparatus. The licenses contained a present agreement to deliver telephones and a present grant of the right to use them. They also contained an agreement that 'the licensor will license to be used with such

telephones the inventions in call bells, switches, switchboards and other apparatus needed for such telephone lines, which it can so license, upon such royalties as it may from time to time establish, not greater than those fixed for others under similar circumstances; but such call bells, switches, switchboards, and other apparatus shall be used only with telephones licensed by the lessor.' Exchange license, form 109 D (5), O. R. 439; extraterritorial license, form 113 D (6), O. R. 454.

"I found that the right to use the subsidiary apparatus and appliances was essential to the practical and profitable use of the telephone itself, and was in that sense invaluable; but I ruled that it was not granted by the contracts or licenses for which the stock was received, but rested upon an independent future consideration, outside of those contracts and licenses, and that the agreement to grant it was a necessary incident of the license to use the telephone instruments themselves. I found it to be a fair, if not a necessary, inference from all the facts and circumstances of the case that, after the discovery of the practicability and value of exchanges and connecting lines (which had taken place before the making of the contract of November 10, 1879), no prudent person would have taken a license for telephones for exchange or extraterritorial purposes, and expended money under it, without a binding agreement for a license for subsidiary apparatus; and that this agreement was therefore necessarily embodied in the license contracts, without a definite stipulation as to what should be exacted for the license when issued, except that the royalties therefor which the licensor should exact from time to time should 'not be greater than those fixed for others under similar circumstances'; and I ruled that it was immaterial in this connection whether, as a matter of fact, the Bell Company did or did not, after the issue of these licenses, issue any additional licenses or exact any additional royalties for the use of this subsidiary apparatus, which all the companies used. I therefore declined to make any separate valuation of the right to use call bells, switchboards and other subsidiary apparatus, or to make any deduction from the stocks to be accounted for on account of that right."

I agree with these rulings of the master that the right to use the inventions in the subsidiary apparatus rested upon a separate and independent consideration, and that at most this right was merely incidental to the main grant.

Among the considerations other than the right to use and rent telephones the defendant also included the right to carry on the extraterritorial business, and claimed that such right was a separate consideration for the stock, and must be excluded from the accounting.

With respect to this claim the master said:

"The extraterritorial business was prosecuted under licenses known as form 113 D (O. R. 449). These licenses expressly stated (5, p. 453) that 'the right and license hereby granted is the right and license to use telephones' on extraterritorial or connecting lines. They provided (4, p. 452) that 'the licensee shall pay to the licensor a rental and royalty' on each telephone, of the same amounts as provided in the exchange licenses, to wit, $10 per instrument and $20 per pair of instruments. They further provided, however (8, p. 456), that the lessee should pay to the lessor. 'in addition to said telephone rental and royalty, and in consideration of the further rights and privileges hereby granted,' one-fourth of the lessee's gross receipts from subscriptions and tolls. The rights and privileges other than the mere right to use and rent telephones were the rights to erect connecting lines between different exchanges, to connect them with such exchanges, and to carry on therewith the extraterritorial business (1, pp. 449, 450; 3, pp. 450, 451; 6, p. 454).

"Plaintiffs made no claim to participate in defendant's share of its licensees' gross receipts from subscriptions and tolls, being for a consideration other than the right to use and rent telephones, but claimed the full right to participate in all stocks received by defendant as rentals and royalties for tele-

phones under these extraterritorial licenses (Bill of Complaint, O. R. pp. 13, 16; Plaintiffs' notice to defendant. O. R. p. 338). And I so ruled. It is admitted that defendant has heretofore accounted to the plaintiffs for the cash rentals received from its extraterritorial licenses, and I ruled that it is also required to account for whatever stocks it received thereunder in lieu of or in addition to cash rentals.

"I ruled that the extraterritorial licenses, for which stock was in part taken, granted more than the right to use and rent telephones on extraterritorial lines, to wit, the right to construct such lines, connect them with exchanges, and carry on a connecting line business with them; and that the latter right rested upon a different consideration than the right to use and rent telephones; and also that the stock issued under the agreements for such licenses was attributable to the licenses as a whole and not to any separable part or feature of them. But I ruled that, as in the case of exchange licenses, the main grant was of the right to use telephones, as shown by the express declaration of the licenses themselves that 'the right and license hereby granted is the right and license to use said telephones' to carry on personal communications between different exchange districts over extraterritorial lines, etc. (O. R. p. 453); and that the right to build, connect, and operate connecting lines, etc., while important and essential to these particular licensees, as the right to use call bells and other subsidiary apparatus was important and essential to all licensees, was nevertheless incidental to the main grant."

I agree with the master's rulings as to this claim. These licenses expressly stated that the "right and license hereby granted is the right and license to use said telephones." Further, so far as these licenses granted other things than the right to use telephones, they either rested upon an independent consideration or were merely incidental to the main grant.

[2] 2. The defendant also claimed that considerations outside the license contracts were given for the stock, and must be excluded from the accounting. These considerations were the "value of the relation which the licensees obtained to the Bell Company and to the Bell permanent system," including "the advantages accruing from the connection with the great Bell organization, protection against patent suits and infringements, financial assistance, the service of its great engineering and electrical talent," etc. The relation created between the parties is termed by the defendant a "partnership arrangement."

This claim of the defendant is based mainly upon the following language in the opinion of the Circuit Court of Appeals:

"We exclude from the accounting anything received by the telephone company in any form which was properly the equivalent of what it possessed the day as of which the contract went into effect; that is, November 1, 1879."

The court then cites as an example of what is exempted from the accounting the case of the value of the option to take the plant, which the defendant had under the short-term licenses, and which it surrendered to the licensees under the permanent licenses.

I do not find any warrant in this language of the Circuit Court of Appeals for holding that considerations of this indefinite character, which are wholly outside the license contracts, entered into and constituted a part of the considerations for this stock. We have in the example cited in the opinion of the Circuit Court of Appeals plainly a property right, which existed on November 1, 1879, and which the

defendant surrendered upon issuing its permanent licenses.    In my
opinion, this language of the Appellate Court cannot justly be so in-
terpreted as to permit the defendant to prove considerations of this
general and indeterminate character, and the evidence as to these con-
siderations was properly excluded by the master.

[3] III. After the master had excluded this evidence as tending to
show other considerations for this stock than the license to use and
rent telephones, the defendant then claimed that this evidence was ad-
missible upon another ground, namely, upon defendant's claim for re-
imbursement for expenditures on the plaintiffs' stock.    This claim is
stated by the master as follows:

"The defendant claimed 'such allowances as may be determined to be equi-
table for expenses incurred by defendant in behalf of or for the benefit of
its licensee companies, for the purpose of increasing the value and earning
power of any stocks to which, or to the dividends upon which, the plaintiffs
may be entitled, for the rights under patents (not relating to the telephone
instrument) and other rights granted or permitted to said companies without
compensation for the same purpose; for services performed for said com-
panies without compensation for the same purpose, no compensation or re-
imbursement for such services, rights, or expenses having been required by
defendant from said companies, because of its understanding under its in-
terpretation of the contract of November 10, 1879, that it was the owner of
all such stocks.'  The claim was therefore, as I regarded it, one for expendi-
tures, services, etc., in the nature of improvements upon rather than the
maintenance of the fund or property in the hands of the defendant, and I
so treated it.

"The plaintiffs contested this allowance on the ground that the defendant
wrongfully withheld the stocks and dividends, and mixed them with their
own, after notice of the plaintiffs' adverse claim.    They maintained that
after such notice the defendant held the stocks and dividends mala fide, and
therefore at its peril.    Notice of the plaintiffs' claim to its portion of these
stocks and dividends was given in writing on February 26, 1883 (O. R. 338),
and the plaintiffs' claims were rejected by the defendant in writing on March
7, 1883 (O. R. 339).    An examination of the Western Union Company's notice
to the Bell Company shows that it then made the precise claim which has
since been sustained by the Circuit Court of Appeals, although it does not
appear clearly from the notice whether it had then been advised of the re-
ceipt by the Bell of any stock under the extraterritorial licenses.    The de-
fendant's rejection of the plaintiffs' claim was unqualified, and unexplained
except by the statement that the defendant found nothing in the contract of
November 10, 1879, or in the circumstances under which the stock had been
acquired, which entitled the Western Union or those it represented to any
portion of it.    In short, the defendant relied upon its construction of the
contract and its understanding of the relations of the parties, and took the
full responsibility of doing so.    Suit was brought on November 16, 1883, when
but 4 of the 17 years of the contract period had expired.

"I entertained no doubt that the defendant's belief in the correctness of its
construction of the contract was a reasonable belief, as shown by the fact
that the defendant prevailed upon its view of the contract both before the
original master and in the Circuit Court.    And I find that such belief was
in fact held in good faith by defendant.

"The plaintiffs contended that such good faith was not enough; that,
where one holds by a contested title after notice of an adverse claim, he
holds at his peril, and is bound to make such separation and segregation of
the joint funds and property in his hands as will enable a ready division of
it to be made, if such a division is ultimately decreed; and that if he fails
to do so, and continues to exercise full dominion over the fund, without ref-
erence to the adverse claimant's contention, he is not entitled to compensa-
tion or reimbursement for expenditures for the improvement of the property.

"Many authorities upon this issue were cited by both parties, and I examined them for the purposes of my ruling. The weight of these authorities, as I construed them, compelled me to rule, and I did rule, that mere proof of good faith and benefit to the fund did not entitle defendant to reimbursement for its expenditures in improving the fund or property in its hands, in view of its knowledge and disregard of the adverse claim of the plaintiffs. Green v. Biddle, 8 Wheat. 1 [5 L. Ed. 547]; Carver v. Jackson, 4 Pet. 1 [7 L. Ed. 761]. I therefore ruled that the evidence tending to show other considerations for the stock than the license to use and rent telephones was not competent in support of the amendment to the defendant's discharge, and disallowed the credits therein claimed."

This point was elaborately presented in the briefs of counsel, and many authorities were cited and discussed. Although the question is not free from difficulty, it seems to me that, as applied to the facts of this case, the rulings of the master were correct and supported by the weight of authority on this general subject.

[4] IV. The defendant further claimed that, if the plaintiffs were entitled to any stock, there should be an apportionment between the contract period and futurity. The claim is stated as follows:

"(5) Under the provisions of said contract of November 10, 1879, the right of the plaintiffs to share in rentals or royalties from licenses or leases for speaking telephones ceased on November 1, 1896. If any portion of the stocks or moneys claimed by plaintiffs in said charge is determined to have been rentals or royalties from licenses or leases for speaking telephones, under the provisions of said contract, or to have been received in lieu of such rentals or royalties, the plaintiffs are entitled only to 20 per cent. of the dividends and income received by the defendant therefrom prior to November 1, 1896. If, instead of sharing in said income, the plaintiffs are entitled to receive any part of the principal, an apportionment thereof must be made between the temporary period ending November 1, 1896, and the period beginning on that date, and the plaintiffs are entitled to share only in the portion properly attributable to said temporary period."

With respect to the apportionment of dividends, the master said:

"The decision of the Circuit Court of Appeals, as I construed it, did not confine the plaintiffs' rights to a participation in the income from licenses, in the narrow and technical sense of that term, but gave the plaintiffs a right to 'share in the net profits of the licenses or leases,' including all net profits, whether realized in the form of income or capital; and that defendant must account for such profits in the form of stock 'precisely as it would be required to account for any gross additions to rentals which it might have received in the form of money.'"

With respect to the apportionment of stock the master said:

"II. Apportionment: Defendant's claim goes further than to limit plaintiffs to dividends only and to the dividends received during the contract period only, and logically results in the alternative proposition that, if the plaintiffs are entitled to any portion of the stock itself, they are entitled only to that part which is apportionable to the period of the contract, or that portion of the contract period remaining after the receipt of the stock, and not to the part which is apportionable to the indefinite future period over which the perpetual licenses extended. I understood the argument to be that the stock being taken in lieu of contemplated annual cash rentals, in which the plaintiffs were to participate only during the period of the contract, they can participate in the stock only to the same extent.

"Assuming the legal proposition just stated to be sound, defendant claimed that there was no legal or mathematical difficulty in applying it, and introduced an expert accountant, who, upon the assumption of a given normal

rate of interest, and by the use of life insurance annuity tables, apportioned or showed how to apportion the various stocks received by the Bell between the temporary period and perpetuity (D. E. 1150-1181, 1425). Considerable evidence was also introduced from competent witnesses tending to prove the normal rate of interest reasonably to be expected from long-time investments of a conservative character. This evidence tended to show that such normal rate is 4 per cent. or a fraction more, and I found for the purposes of this case that it is 4 per cent. The accountant referred to used this percentage in making the apportionment referred to, and which is annexed to this report marked 'Exhibit H.' And I found the apportionments made by him, as set out in said exhibit, mathematically correct.

"Plaintiffs introduced no evidence to controvert or control that of the defendant upon this point. Their position was stated in their brief as follows: 'The plaintiffs have no controversy with the mathematical result, which is reached by the witness for the defendant; but the plaintiffs claim that such mathematical method cannot be applied to this case, for the reason that the conditions are so entirely dissimilar to the case considered by the witness.'

"It was early suggested and agreed that the dividend question was one of such character and importance that it should be submitted to the court on alternative findings; and, while at first there was objection by the plaintiffs to a similar disposition of the question of apportionment, I understood them subsequently to acquiesce in it. In any event, I think that to be the proper course of procedure, as the two subjects are closely related to each other and depend largely upon the same considerations. Although both subjects were fully developed before me, they are submitted to the court without prejudice to the right of the parties to treat them as submitted on alternative findings. I therefore submit herewith, in addition to the dividend statement ('Exhibit G'), a statement marked 'Exhibit I,' showing the portions of the stocks, to wit, 10,816.33 shares, to which plaintiffs are entitled upon the theory that, if the plaintiffs are entitled to any stock, they are entitled only to that part of it which is apportionable to the contract period, with a statement of the dividends upon such stock, amounting to $1,036,251.59, and the interest on such dividends to April 1, 1909, amounting to $683,904.93, as well as the amount of franchise cash and interest thereon, amounting together to $21,319.65, attributable to the same period.

"The findings tabulated in 'Exhibits G and I,' together with the findings tabulated in 'Exhibit J,' may be treated as the alternative findings above referred to."

I find nothing in the opinion of the Circuit Court of Appeals to warrant an apportionment of either dividends or stock, as claimed by the defendant. The telephone patents were combined in the hands of the defendant under the contract of November 10, 1879. The contract ran for 17 years, and patents are granted for 17 years. This, therefore, was the period of the monopoly secured by the patents, and hence the period during which these patents would be by far the most valuable. Under these conditions it would seem quite impossible to apply any equitable or satisfactory method of apportionment to this stock.

Again, so far as the Court of Appeals has in any way referred to this subject, what it said is against the plaintiffs' claim. In the first place, it treats this stock as the equivalent of money. Further, in the course of its opinion, the court observes:

"If, for example, in lieu of the 'ten dollars per annum,' named in paragraph 2 of article 1, the telephone company received, either in shares of stock or money, $100 for a 10 years' license, which seems to have been commonly granted, or $170 for a perpetual license, which would mean the entire 17 years for which the contract ran. either hypothesis readily computes an annual rental of $10; and, if received in advance, it must likewise be accounted for in advance."

The court here appears to treat the period of 17 years as applied to the contract of November 10, 1879, as the equivalent of a perpetuity, although it cannot be said that this language of the court is a conclusive finding on this question.

[5] V. The defendant further claims that if, under the decision of the Circuit Court of Appeals, any portion of this stock was rentals for licenses to use telephones, the account for the cash rentals already settled between the parties must be reopened, and readjustments made. The most important of these readjustments is an allowance of 30 per cent. commission on the annual cash rentals which have been paid to the plaintiffs. The claim for this allowance is stated as follows:

"(3) Thirty per cent. of all payments heretofore made to the plaintiffs on account of telephones used in district or exchange systems owned in whole or in part by the defendant or by auxiliary corporations or organizations in which it was interested, being the commissions and allowances to which the defendant is entitled under the provisions of said contract of November 10, 1879, and not heretofore charged to the plaintiffs because of the defendant's understanding of said contract, together with proper interest allowances upon said credits."

With respect to this claim the master says:

"This claim practically applies to all cash rentals received by or rated as paid to the defendant for exchange telephones, because, upon the issue of the permanent licenses, practically all exchange telephones in use were 'used in district or exchange systems owned in whole or in part by the defendant or by auxiliary corporations or organizations in which it was interested.'

"Plaintiffs' preliminary objection to this claim was that it was not open before the master; that the Circuit Court of Appeals having determined that 'the only issue is the ascertainment as to certain shares of stock received by the telephone company since November 1, 1879, in consideration in whole or in part for licenses to use telephones,' the rule applied that neither the master nor the Circuit Court can enlarge the issue thus stated. [Bissell Carpet Sweeper Co. v. Goshen Sweeper Co.] 72 Fed. 545 [19 C. C. A. 25].

"But I ruled that, as the court had determined the issue to be not only the ascertainment of the stock referred to, but also 'the incidentals appurtenant thereto,' included among such incidentals are dividends, interest, commissions, allowances, rebates, etc., and that the court had not required the omission from the accounting of anything reasonably and properly incidental thereto. I further ruled that if defendant overpaid plaintiffs upon its theory of accounting, which has turned out to be an erroneous theory, and is now required to account upon what has been judicially determined to be the correct theory, it should be allowed to correct mistakes made against itself, as well as required to rectify mistakes made against the plaintiffs, under its original understanding of the requirements of the accounting.

"Defendant's claim for an allowance to it of a 30 per cent. commission set out in article 6 (3) of its discharge applies to the annual cash rentals or royalties actually received by or rated as paid to the Bell, upon which, under article 1 of the contract of November 10, 1879, the Western Union was to receive a royalty or bonus of 20 per cent., and for which defendant has already accounted to the plaintiffs. Its claim, as I understood it, was that it has accounted for too much, because it has paid plaintiffs 20 per cent. on the gross cash rentals, instead of 20 per cent. on the net cash rentals, received by it.

"As there was no dispute about the facts relating to this issue, and as my rulings necessarily rested upon an analysis of the terms of the contract applicable to those facts, I cannot make an intelligent statement of my rulings without stating the steps which lead up to them.

"There can be no question as to what the cash rentals or royalties actually were. Article 8 of the exchange licenses (109 D., O. R. 441), issued to the

licensee companies, required them to charge their subscribers such rentals and royalties for telephones as the Bell might fix from time to time, and to pay over to the Bell a fixed percentage of such rentals and royalties. The annual rentals and royalties were then fixed at $10 per instrument and $15 (soon changed to $20) per pair of instruments. The licensee collected the $20, retained a commission of 30 per cent. or $6, and paid over to the Bell $14; the latter amount being the amount actually realized by the Bell as cash rental or royalty. For 20 per cent. of this amount, to wit, $2.80 per pair of telephones, the defendant has heretofore accounted to the plaintiffs. But the defendant now claims that the $14 was subject to another discount of 30 per cent. before being accounted for to the plaintiffs, and that it should have paid over to the plaintiffs $1.96 instead of $2.80, and has thus overpaid plaintiffs 84 cents on each pair of telephones. This claim aggregates over $1,600,-000, with interest.

"This claim rests, as I understand it, upon the proposition that, if defendant must account for whatever it received from its licensees rather than for a portion of what was paid by telephone subscribers to the licensees, the rule as applied to the accounting for cash rentals requires it to account only for the amount actually received by it from its licensees, to wit, $14 per pair of telephones, less the commission or allowance of 30 per cent. provided for in article 2, paragraph (3), of the contract of November 10, 1879.

"The contract of November 10, 1879, provided a rule for ascertaining the rentals or royalties in which the plaintiffs should have an interest. Article 1 provided that they should be ascertained by deducting from the gross rental or royalty received by or rated as paid to the Bell Company the commissions and allowances thereinafter referred to. Article 2 provided that the sums which should be taken as the gross rental or royalty for the purposes of the preceding article should be $10 per annum per telephone, and $15 (shortly afterwards raised to $20) per annum per pair of telephones. These sums were 'recognized as the present standard rates of gross rentals or royalties.' Article 2 further provided that telephones used on exchanges or lines owned in whole or in part by the Bell Company or by auxiliary corporations in which it was interested should be rated as paying to the Bell Company the said recognized standard rates, less the commissions and allowances provided for by the contract. Article 3 provided that in ascertaining the rentals subject to the plaintiffs' royalty or bonus there should be deducted from the gross rentals certain commissions and allowances, including the following: 'On telephones used in district or exchange systems owned in whole or in part by the party of the second part or by auxiliary corporations or organizations in which it is interested, an allowance or commission of thirty per cent.'

"Other deductions ranging from a lower to a higher figure than 30 per cent. were provided for in some instances; but, upon the issue of the permanent licenses and the taking of stock therefor, practically all the exchange companies became corporations in which the Bell was interested. The 30 per cent. allowance or commission is therefore the typical allowance or commission and the only one of practical importance in this connection. It was used in making up the accounts which have heretofore been settled between the parties.

"In applying these rules to the ascertainment of the plaintiffs' share of rentals, I deemed it obvious that the basis of all calculations must be the amount of gross rentals. It was from gross rentals that all the allowances or commissions named in the contract were to be deducted. This was not a matter of form, but of substance; the purpose and intent being to give the plaintiffs a one-fifth interest in all sums realized by the Bell as the owner of the joint patents, or, as the court put it, 'its share in the net profits of the licenses or leases.' This share can only be ascertained by determining the net profits, and the net profits can only be ascertained by deducting from the gross profits whatever allowances or commissions are called for by the contract.

"The net cash rentals realized by the Bell as the owner of the patents were those remaining after an allowance or commission to its licensees of

30 per cent. of the gross cash rentals paid by the telephone subscribers. The net stock rentals realized by the Bell as the owner of the patents were those remaining to it after an allowance or commission to itself as licensee of 30 per cent. of the gross amount of stock so received. The allowance or commission out of gross cash rentals made to licensees was made to them under article 8 of their licenses for doing the business of placing the instruments with subscribers, collecting the rentals, etc.; the allowance or commission on gross stock rentals made to the Bell was made pursuant to the express terms of article 3 of the contract of November 10, 1879, the purpose of which was, as I view it, to put the Bell on equally favorable terms as other licensees, in cases where it owned exchanges or was interested in auxiliary corporations owning exchanges.

"In both cases the deduction of the commission or allowance (called in the license form 109 D, and in defendant's circulars of January 31, 1894, and February 15, 1895 [D. E. 79, 80], a 'discount,' and in article 3, paragraph 2, of the contract of November 10, 1879, 'an abatement') was necessary to ascertain the net amount realized by the Bell as the owner of the patents and therefore divisible with the Western Union. For the Western Union to take anything less than its share as thus determined would be to give the Bell more than its share as the owner of the patents.

"In both of the Bell's circulars to its licensees above referred to (see D. E. 79, 80), gross cash rentals are clearly and unmistakably indicated as those paid by the subscribers, and net cash rentals as those turned over to the Bell by its licensee companies; the latter being ascertained by deducting from the former certain 'discounts' allowed to the licensees. Whether the money paid by the subscribers came directly to the Bell in the first instance and 30 per cent. was handed back by it to the licensee, or whether the licensee collected the whole amount and paid over 70 per cent. to the Bell and kept 30 per cent. for its commission, the result was the same. It was a mere matter of convenience, and did not affect the substance of the transaction. What the Bell realized as its net cash rental or profit as licensor under the patents was the $20 gross rental paid by the subscriber, diminished by the 30 per cent. allowance, commission, or discount retained by its licensee. This gave it the net amount of $14 per pair of telephones. Plaintiffs, being entitled to 20 per cent. of the net cash rentals received by defendant, have been paid 20 per cent. of $14, or $2.80, for each pair of telephones, which I deemed to be the amount required by the terms of the contract of November 10, 1879.

"I therefore ruled that defendant was not entitled to the credit on cash rentals already accounted for claimed in article 6 (3) of its discharge, and declined to make any deduction on that account from the cash payments otherwise due from the defendant to the plaintiffs in the accounting.

"The defendant's claim under this article of its discharge amounted to $1,633,524.41, with interest to April 1, 1909, amounting to $1,848,943.31, making in all to that date $3,482,467.72."

I agree with these rulings of the master for the following reasons:

Under the contract of November 10, 1879, the Western Union was to share in the gross rental for licensees to use telephones less the commission; in other words, in the net rental. This commission presumably was allowed to cover the services and expenses incident to the development of the telephone business. In order that the Bell Company should be put upon an equality with its licensees in cases where it owned exchanges in whole or in part, it was allowed a commission of 30 per cent.; and this had come, as the master finds, to be the typical commission in all cases.

The Bell Company has settled with the Western Union on this basis with respect to cash rentals. For example, the cash rental for a telephone in the contract was $10. This was gross rental. From this

there was deducted a commission of 30 per cent., or $3, making the net rental $7. The Western Union, under article 1 of the contract, was entitled to 20 per cent. of $7, which is $1.40, for a single telephone; and the Bell Company has already accounted to the Western Union for cash rentals on this basis.

What the Bell Company now claims, in effect, is that these cash rentals are subject to an allowance of two commissions of 30 per cent.—that is, after the licensee has deducted a commission of 30 per cent., making the net rental $7, the Bell Company is entitled to another commission of 30 per cent., thereby reducing the $7 to $4.90—and that the Western Union is only to receive 20 per cent. of this amount. This claim for repayment by the Western Union amounts, with interest, to $3,482,467.72.

There appears to be no warrant or justification for such a construction of the contract of November 10, 1879. That contract unmistakably limits the commission on gross rental to a single commission. As an original proposition, I doubt if such a construction of the contract would ever have been seriously advanced by any one. It is only just to the defendant to say that it does not believe in such a construction of the contract, and that its present position is that this result follows logically from the decision of the Circuit Court of Appeals holding that any portion of this stock is gross rentals for licenses to use telephones, assuming, which the defendant questions, that the court has so decided.

The argument of the defendant in support of this claim may be stated as follows:

Net cash rental in which the plaintiffs are to share means gross cash rental less commission.

Net stock rental in which the plaintiffs are to share means gross stock rental less commission.

As a starting point in this accounting it is necessary to determine the meaning of gross rental and to apply that meaning to both forms of rental.

"Gross rental" means either the sum paid by the telephone user to the licensee company or the sum paid by the licensee company to the defendant. If gross rental means the sum paid by the telephone user to the licensee company, this stock is not gross rental, and is not, therefore, subject to any accounting. If gross rental means the sum paid by the licensee company to the defendant, under the decision of the Circuit Court of Appeals, then that meaning must be applied to both gross cash rental and gross stock rental.

Now, the defendant says that the gross cash rental paid by the licensee company to the defendant is not $10 per telephone, but $7 per telephone, and the net cash rental, therefore, is $7 less 30 per cent. commission; hence it follows that the Bell Company has overpaid the Western Union a sum which, with interest, amounts to $3,482,-467.72, since the account for cash rental was settled on the theory that rental means the sum paid by the telephone user to the licensee company, which was $10 per telephone.

This whole argument is based upon the assumption that gross rental must have a fixed, unchangeable meaning in the contract of November 10, 1879.

This assumption, however, is not sound for these reasons:

1. The Circuit Court of Appeals has already decided this question and decided it adversely to the defendant, since it has specifically held that rental does not have a fixed, unchangeable meaning in the contract of November 10, 1879. It may be said, therefore, that this whole argument which the defendant now advances in support of this claim is the same argument which it has advanced from the beginning of this case, and which failed to convince the Circuit Court of Appeals.

2. Assuming it is a matter of demonstration, under the contract of November 10, 1879, and the license contracts, that cash rental is the sum paid by the telephone user to the licensee company, it still remains true that the Circuit Court of Appeals has decided that rental means something more than the cash rental named in the contract, and that, by reason of the fiduciary relation between the parties and the broad terms of the first paragraph of article 1, it includes this stock which the defendant received from its licensees under licenses to use and rent telephones.

In his rulings upon this claim the master says:

"The net cash rentals realized by the Bell as the owner of the patents were those remaining after an allowance or commission to its licensees of 30 per cent. of the gross cash rentals paid by the telephone subscribers. The net stock rentals realized by the Bell as the owner of the patents were those remaining to it after an allowance or commission to itself as licensee of 30 per cent. of the gross amount of stock so received."

This language of the master, in my opinion, clearly defines the net cash rentals and the net stock rentals in which the plaintiffs are to share under the decision of the Circuit Court of Appeals.

VI. In its opinion, the Circuit Court of Appeals said that such portion of this stock as represents the value of the options surrendered by the Bell Company is "not to be accounted for." Upon this point the master says:

"In nearly all the short-term licenses issued prior to November 1, 1879, it was agreed that upon the termination of the licenses the Bell Company might take over the plant of the licensee at a valuation not including that of any telephone franchise.

"These short-term licenses either expired or were surrendered by the licensees, and thereupon the defendant gave them perpetual licenses, without reserving any option or right to take over the plant or property of the licensee at any particular time, but only in case of the licensee's default.

"The complainants contended that this was not a surrender of an option in any true sense, but the necessary result of substituting for a short-term license a perpetual license which ran for the life of the patents.

"The defendant, on the other hand, attached the greatest importance to the surrender of these options. It claimed that they constituted in reality the practical ownership of the exchanges themselves, and that they were at least to be regarded as the privilege of taking over an established business in a situation where no license had been granted.

"The Circuit Court of Appeals dealt definitely in its decision in this case with the options which existed prior to November 1, 1879, and were surrendered after that date, and excluded from the accounting whatever may have been received for the surrender of these options, as it likewise excluded anything received by the telephone company in any form which was properly the equivalent of what it possessed the day as of which the contract went into effect.

"Notwithstanding the importance attached to the surrender of these options by the defendant, no evidence was offered which enabled me to determine the value to the local companies of their surrender. The defendant disposed of the subject in its final brief by stating that 'it can be dealt with properly only as incidental to and part of the considerations other than the right to use telephones to November 1, 1896, and not as a separate and distinct consideration to be valued by itself.' "

In the absence of evidence which would enable the master to determine the value of the options, I am unable to see that he could have made any other ruling on this subject.

We come now to the more important exceptions taken by the plaintiffs. These relate to the stock received by the defendant from four of its licensee companies, which the master exempted from the accounting.

The Circuit Court of Appeals in its opinion said that the defendant is entitled to retain "anything received by it in any form which was properly the equivalent of what it possessed the day as of which the contract went into effect; that is, November 10, 1879."

This language of the Circuit Court of Appeals is the main ground upon which the master excluded this stock. As the master says:

"This ground of exemption is common to all four cases; but other reasons for exemption are urged in the individual cases."

1. The first of these companies is the American Telephone & Telegraph Company. As to this company, the master, after a preliminary statement of facts and circumstances, says:

"The Bell Company did the extraterritorial business itself long prior to November 1, 1879 (D. E. 192), and down to the organization of the American Company in 1885. Inasmuch as it owned all the stock of the latter company, it practically continued to do the long-distance business itself after that date. The American Company seems to have been organized and maintained mainly as a matter of convenience (D. E. 841). The long-distance business was at first experimental and nonprofitable, the Bell Company receiving for many years much less in the form of dividends upon its stock than simple interest upon its investment (D. E. 207). This and other reasons (D. E. 212) led it to carry on this branch of its business after 1885 under a separate organization, until this department was consolidated with the other departments of its business a few years ago.

"On March 30, 1895, the American Telephone & Telegraph Company issued to the American Bell Company 25,000 shares of franchise stock, of the par value of $2,500,000, which has never been increased. Plaintiffs claim one-fifth of this stock, with dividends and interest.

"Plaintiffs' claim is made under the broad provisions of article 1 of the contract of November 10, 1879, which entitled them to a part of all telephone rentals and royalties received or rated as received by the Bell Company, unless expressly excepted, and particularly under the provisions of article 2 (3) of that contract, which expressly reserved to the plaintiffs an interest in the rentals of all telephones used on exchanges or lines owned in whole or in part by the Bell Company, or by auxiliary corporations in which it is interested, which telephones are rated as paying the recognized standard rentals. Defendant contests this claim (1) because the business was, in fact, if not in form, the exclusive property of the Bell Company itself, and always was, and therefore within the terms of the limitations of the accounting laid down by the Circuit Court of Appeals; and (2) because the business was both in form and substance an extraterritorial business, and as such excluded from the participation of the Western Union by the provisions of article 13 of the contract of November 10, 1879.

"I find that on and before November 1, 1879, the defendant exclusively owned and personally prosecuted the extraterritorial business which was prosecuted by the American Telephone & Telegraph Company after its organization in February, 1885, and finally under its license of January 1, 1894; that that business was exclusively an extraterritorial business as defined in the defendant's extraterritorial licenses; that the American Telegraph & Telephone Company was organized by the defendant, which owned and paid for all its stock; that the license of January 1, 1894, was issued merely as a matter of precaution and business discretion; that 25,000 shares were issued by the American Company to the Bell Company on March 30, 1895, as franchise stock, pursuant to the requirement of the license; that no more was ever issued; and that in 1900 the American Company absorbed the Bell Company, from which it received the license of January 1, 1894.

"I ruled that, upon the foregoing facts, the license of January 1, 1894, did not give to the licensee any rights which it did not have before, and that the defendant is not bound to account to the plaintiffs for any of the shares of the capital stock of the American Telegraph & Telephone Company received pursuant to said license. I have therefore deducted from the amounts claimed to be due to the plaintiffs in this accounting 20 per cent. of the shares of that company received by the defendant, to wit, 5,000 shares, together with the dividends on those shares, amounting to $131,250, and interest on the dividends to April 1, 1909, amounting to $90,185.62, making in all $221,435.62 (see Exhibit J)"

I agree with the rulings of the master that this stock was properly excluded from the accounting under the decision of the Circuit Court of Appeals, upon the ground that it was the equivalent of what the defendant possessed on November 1, 1879.

Under the contract of November 10, 1879, the Bell Company could carry on the exchange business or the extraterritorial business itself, or could license a company for that purpose. If it chose to carry on the business itself it was entitled to the profits, and it was only obliged to account to the Western Union for 20 per cent. of the cash rentals. If it chose to license a company to carry on the business by issuing to it a permanent license to use telephones, and it received in return a share of the profits of the business in the form of stock, this stock must be considered as rentals for which the Bell Company must account to the Western Union in addition to cash rentals. This is the essence of the opinion of the Circuit Court of Appeals.

In the first part of its opinion the court says:

"The master, among other things, reported:

"'I am of opinion that by the contract the defendant clearly had the exclusive right to carry on the exchange business, alone or jointly with others, and to receive its profits, paying to the plaintiffs 20 per cent. of the stated rentals.'

"It is clear that the Western Union had, under the contract, no interest in the exchange business which the telephone company owned, in whole or in part, or in the profits received therefrom, so far as either can be distinguished from considerations for the mere licensing of telephones, or so far as the advantages which came from them to the telephone company came as the result of a contribution by it aside from that of such mere licensing. It is also clear that when, even after the contract of November 10, 1879, the telephone company had properly acquired any part of an exchange, the complainants had no interest in the subsequent profits which might come therefrom."

This language clearly shows that, if the Bell Company elected to carry on the business itself, it was entitled to the profits of the business.

Near the close of its opinion the court states what is excluded from the accounting as follows:

"We exclude from the accounting anything received by the telephone company in any form which was properly the equivalent of what it possessed the day as of which the contract went into effect; that is, November 1, 1879."

Taking these two statements in the opinion together, it follows that, if the Bell Company on November 1, 1879, was, in fact, carrying on the exchange business or the extraterritorial business, and should subsequently sell the business, it would only be selling what it possessed on November 1, 1879; and, if the form of the sale was a permanent license under which it received stock in the licensee company, such stock would be the equivalent of what it possessed on November 1, 1879. This is the basic question involved in these special cases. The plaintiffs base their main argument against the exclusion of this stock in these special cases on the proposition that it was received for licenses to use telephones, and therefore was within the provisions of the contract of November 10, 1879, and within the decision of the Circuit Court of Appeals. The answer to this argument, in my opinion, is that the plaintiffs fail to give full force and effect to what the Circuit Court of Appeals has specifically excluded from the accounting.

2. The second of these four licensee companies is the New England Telephone & Telegraph Company. With respect to this company the master says:

"Under a license agreement dated October 31, 1883 (P. E. 250), the New England Telephone & Telegraph Company agreed to issue to the American Bell Telephone Company 62,443 shares of the capital stock of the former. The number actually issued pursuant to said agreement appears, from a statement submitted by the defendant (D. E. 1645) and not controverted by the plaintiffs, to have been 62,156, a discrepancy of 287 shares not accounted for. To the number first issued were subsequently added 800 shares, making the total number of shares received under the agreement 62,956. The plaintiffs made no claim to 19,476 of these shares, but only to one-fifth of the remaining 43,480 shares. Of these 43,480 shares, 19,477 shares were received by the defendant in connection with the sale of its Boston business to the New England Company and the issue to that company of a license to cover the future prosecution of the business by it, and defendant claimed that they should be excluded from the accounting.

"Prior to the grant of the license to the New England Company on October 31, 1883, and prior to November 1, 1879, the telephone business in the Boston district had been prosecuted by the Bell Company itself under a department of its own known as the 'Telephone Despatch Company,' and nobody else had any interest in said business (O. R. 226; D. E. 1497–1499). No license was issued, because the Telephone Despatch Company was not a corporation or legal entity, and there was no occasion for the Bell Company to license itself. When the business of northern New England was consolidated in the hands of the New England Telephone & Telegraph Company, the licenses held by the various companies entering into the consolidation were surrendered, and a new license covering the combined territory was issued. In so far as the new license was in substitution for surrendered licenses of the same character, it called for no stock except in exchange for the stocks of former licensees surrendered by the Bell. In so far as it represented the Boston territory, it was in form a new license, as the Bell had not issued a license to itself nor to that department of its business known as the Telephone Despatch Company; but, as applicable to the Boston territory, the license was a mere formal statement of a pre-existing right, and not a grant of a new right or

privilege.· When the Bell Company sold its Boston plant and business to the New England Company, as it did as a part of the transaction of October 31, 1883, it became necessary to give to the purchaser some evidence of its right to use· the patented articles included in the sale. The license was therefore made to include the Boston district, as well as the remaining territory of the licensee.

"The plaintiffs' claim to a share of the stock received in connection with the ·issue of this license rested, as I understood it (D. E. 1500), upon the provisions of article 2 (3) of the contract of November 10, 1879, which dealt with cases where the Bell. itself might, directly or indirectly, own an exchange, in whole or in part, and provided that in such cases the licensee should, as between the parties to the contract of November 10, 1879, be rated as paying the standard rentals. But I ruled that that provision did not apply to a special case like that of Boston, where the Bell Company had always owned the Bell exchange and had agreed in the contract of November 10, 1879, to purchase the Western Union exchange forthwith. Upon the evidence before me I found that the right to use telephones in the Boston district was solely and completely in the Bell Company itself on November 1, 1879; that the Bell was recognized by the parties, not only as the sole owner of the Boston business prosecuted under the Bell patents prior to November 1, 1879, but as the sole proprietor of the business under the combined patents of the two companies on and after that date; and I ruled that when it subsequently transferred this business to another company, accompanying its transfer of. the patented property with a license to use it, and took stock for both the property and the license, it was disposing of nothing except what it possessed on November 1, 1879, and which it had a right to treat as its own and sell or dispose of during the term of the contract of November 10, 1879, without participation by the Western Union.

"I therefore ruled that the defendant is not bound to account for all of the 43,480 shares in which the plaintiffs claim an interest, but only for the number of such shares remaining after deducting the 19,477 shares received in connection with the transfer of the Boston business and the issue of the license covering the Boston territory, to wit, 24,003 shares. I have, accordingly, deducted from the 8,696 shares claimed by the plaintiffs one-fifth of the 19,477 shares excluded from the accounting, to wit, 3,895.4 shares, leaving to the credit of the plaintiffs 4,800.6 shares. I have also deducted from the cash otherwise due to the plaintiffs the dividends received on the 3,895.4 shares excluded as aforesaid, amounting to $412.070, and interest on said dividends to April 1, 1909, amounting to $229,079.80, making a total cash deduction of $641,149.80 (see Exhibit J)."

For the reasons previously stated in the case of the American Telephone & Telegraph Company, these ·rulings of the master are in accordance with the decision of the Circuit Court of Appeals.

[6] 3. The third of these companies is· the Bell Telephone Company of Philadelphia. ·'This claim is stated by the master as follows:

"Article 1 of the ·contract of November 10, 1879, entitled the Western Union to a share of all rentals and royalties actually received by the Bell Company from its licenses or leases of speaking telephones. The contract went into effect November 1, 1879, ·and remained in force for 17 years. Unless ·controlled by. some special provision of the contract, the Western Union Company was therefore entitled under its general terms to share in all rentals and royalties on telephones actually received by the Bell Company between November 1, 1879, and November 1, 1896. Plaintiffs claim one-fifth of 1,003.5 shares of the Bell Telephone Company of Pennsylvania, which were received in exchange for 2007 shares of the Bell Telephone Company of Philadelphia.

·"The Philadelphia stock was received under a contract with the Bell Telephone Company of Philadelphia, executed on November 10, 1879. This date does not appear in the contract itself, but is established by the evidence (O. R.·237). Sixteen hundred shares were received upon the execution;· of the contract, and 407 shares were subsequently received during the· period of the

contract of November 10, 1879, making 2007 shares in all. Dividends upon all these shares have been received since June 29, 1880.

"Plaintiffs claimed that the fact, if found to be a fact, as claimed by the defendant, that this stock was contracted for prior to November 1, 1879, is immaterial; that the date of its actual receipt governs; that if annual money rentals had been contracted for prior to November 1, 1879, and received later during the term of the contract of November 10, 1879, they would have been subject to its provisions; that this stock was actually received for a license to use telephones, just as the cash rentals were; and that the cash rentals have been accounted for.

"The defendant contended that a date of a contract between the Bell Company and one Cornish governed the whole transaction, and that that date was prior to November 1, 1879, namely, June 3, 1879; that the right to the stock for the license accrued at that time; and that therefore the transaction comes exactly within the scope and meaning of the ruling of the Circuit Court of Appeals; that nothing is subject to the accounting hereunder which was 'the equivalent of what it [the Bell Company] possessed' on November 1, 1879.

"The defendant's claim, as I understood it, was that the Bell Company had the full, complete, and matured right to this stock on June 3, 1879, and is therefore not bound to account for it. If this stock had actually come into the possession and ownership of the Bell Company prior to November 1, 1879, it would not, under the ruling of the court, be subject to contribution; but the Bell Company did not have the stock itself prior to November 1, 1879, but had an agreement for the stock, and the question is whether this agreement was in point of law the same thing as the stock itself."

The rulings of the master were as follows:

"I ruled that the stock was absolutely due the Bell if and when the Philadelphia Company was organized as agreed. The Philadelphia Company was so organized on September 18th. The right to the future receipt of the stock was in the Bell Company on June 3d. Its right to the immediate receipt of it matured on the organization of the corporation, September 18th.

"Against this the plaintiffs said that the stock was 'actually received' by the Bell after November 1, 1879, and was therefore within the exact terms of the contract of November 10, 1879. This would be so except for the rule announced by the court that the Bell Company could keep, free of contribution, anything which it possessed on November 1, 1879.

"I ruled that prior to that date it possessed the right to this stock, subject to no contingency except the organization of the company which was to issue it. This could be done and was done under the general laws of Pennsylvania. When done, the Bell Company's right to the stock matured under the agreement of June 3d. * * *

"I was of the opinion and ruled that, upon the foregoing facts and findings, the shares thus received and the shares of the Bell Telephone Company of Pennsylvania for which they have been exchanged are not, under the ruling of the court, subject to this accounting. I have therefore deducted from the amounts claimed to be due to the plaintiffs in this accounting 20 per cent. of the 1,003.5 shares of the Bell Company of Pennsylvania received in exchange for the 2,007 shares of the Bell Company of Philadelphia, namely, 200.7 shares of the Pennsylvania Company (which are a part of the 2,431.3667 shares of that company shown in Exhibit D2 as claimed by the plaintiffs), and the dividends and interest on dividends on the stock of the Philadelphia Company originally held and on the 200.7 shares of the Pennsylvania Company received in exchange therefor, as follows:

| | |
|---|---:|
| Dividends on Philadelphia stock | $ 51,732 45 |
| Interest on above dividends to April 1, 1909 | 53,891 16 |
| Dividends on Pennsylvania stock | 1,505 25 |
| Interest on above dividends to April 1, 1909 | 64 23 |
| Making a total of | $107,193 09 |

—deducted from the total amount of cash otherwise due to the plaintiffs, as shown in Exhibit J."

Although the facts in this case present a somewhat different question from the two previous cases, I agree with the ruling of the master that, previous to November 1, 1879, the defendant possessed the right to this stock, and hence that it came within the rule of exemption laid down in the opinion of the Circuit Court of Appeals.

4. The fourth company is the Chicago Telephone Company. With respect to this company the master says:

"The ascertainment of the merits of the claim of the plaintiffs for a share in the stock of the Chicago Telephone Company was beset with great difficulties, owing principally to the looseness with which the business in Chicago was at first conducted (D. E. 253) and the several transactions regarding the issue of the stock recorded. To an intelligent consideration of the matter a brief historical view is indispensable."

Here follows an exhaustive statement of the history of this company.

The master continues:

"Upon the facts above recited defendant claimed that the Illinois Bell stock was received prior to November 1, 1879, in consideration of the agreement of the Bell Company to transfer to the Illinois Bell its property in Chicago as it then existed, and to grant a license to the Illinois Bell; that this license had not been executed when the Illinois Bell transferred its property and rights to the Union Company; that the proposed grant of a license by the Bell Company to the Union Company, and the cancellation of $30,000 of the Union Company's debt, were merely the fulfilment by the Bell Company of its earlier obligations to the Illinois Bell; that the Union Company's stock and the Chicago Telephone stock for which the Union Company stock was exchanged were therefore properly the equivalent of what the Bell possessed on November 1, 1879; that the Bell received no stock in consideration for the license to the Chicago Telephone Company, that license being issued under the terms of the agreement for harmonization of the Bell and Western Union interests in Chicago of June 15, 1880, which provided (P. E. 88) that the Bell Company should give the company to be organized 'a full license for all purposes similar in character to that of the Metropolitan Telephone & Telegraph Company of New York.'

"On the other hand, plaintiffs pointed to the fact that Mr. Storrow, who was in charge of the Bell's legal matters, in a letter to Chicago attorneys dated October 27, 1880 (D. E. 279), said that the company in Chicago, which was then the Illinois Bell, 'has no license and no definite terms have been agreed upon'; and that, adopting the rule established in New York and Philadelphia, 'we should take about thirty per cent. of the stock [to be received for all the Chicago property, business, rights, and franchises] to pay for the licenses,' and sell the rest. On this suggestion, $66,000 would be for the license and $154,000 for sale. He further said that the new company was to have a license substantially like that of the consolidated New York Company, and that Gen. Stager 'has a draft of it in Chicago with him.' This certainly indicates at least that, if the Chicago Telephone Company came into 'a right to a license' through inheritance from the preceding companies in Chicago, Mr. Storrow understood that the definite terms of such a license were still the subject of negotiation. Referring to a suggested program of ratification, he said that he was not sure 'whether it should include the grant of a license, or only the power to negotiate for one.' He added: 'Under our W. U. agreement of November 10 we cannot give a license free from claims under W. U. patents until consolidation, and certainly shall not give a guaranty against patent suits, nor leave to connect with any company except the W. U., because the latter would disable us from bringing about the consolidation which we have agreed to work for."

The master proceeds:

"Adopting the same view as to the Chicago situation which has been taken of the Boston situation, although the two cases differ in details, it may be

said that, as the Bell Company itself was the real party prosecuting the local business, it needed no license, or was 'automatically licensed,' and that, when it ultimately came to issue a written or printed license, it was merely transferring and defining what already existed, and was not granting a new right or license. The various corporate organizations preceding the Chicago Telephone Company were in fact mere names under which the Bell Company itself did the business, which rendered it unnecessary that the terms, conditions, and limitations of their right should be precisely defined; but, when the time came for the license to pass into the hands of an independent licensee, it became necessary for the first time to state its terms and conditions. This view tends to remove the apparent inconsistencies between Mr. Storrow's statement of October 27, 1880, and the defendant's present claim, and justifies the conclusion that though the license was for the first time reduced to writing under date of December 23, 1881, and covered a territory not identical with that described in the license of November 7, 1878, and some of the detailed terms of which were not settled until the harmonization arrangement was effected in Chicago, it nevertheless was merely the statement or evidence of a pre-existing license or right to a license, which was held originally by the Illinois Bell Company and was paid for by it when it issued its stock to the Bell Company of Boston, some time between January 3, 1879, and November 1, 1879. On that view the Chicago stock is not subject to this accounting, and I adopted that view.

"I did not overlook the fact, or the apparent difficulty of reconciling it with the conclusion above stated, that in the schedule annexed to the contract of November 10, 1879, the Bell Company did not mention Chicago among the few places where 'the owners of the Bell patents have granted licenses, or made agency contracts,' although it was mentioned among the 'exchanges established and using telephones furnished by the Gold & Stock Telegraph Company, but in which neither the Western Union Telegraph Company nor the Gold & Stock Telegraph Company have any interest.' But I think it would be impossible to come to any conclusion with respect to the Chicago situation which did not disregard some circumstance, which, if standing alone, might well be claimed to compel a different conclusion. As a matter of fact, however, this circumstance does not stand alone. In the memorandum of harmonization (P. E. 88), made several months after November 10, 1879, viz., June 15, 1880, dealing with the Chicago situation alone, and with the license to be issued for it, it was distinctly stated that 'no license having been granted to any company in the city of Chicago except that to the Bell Telephone Company of Illinois'—a statement entirely consistent with and confirmatory of the conclusion above reached that the Illinois Bell received a license or a right to a license in exchange for $50,000 of its capital stock in 1879, and that that license or right was transferred from one company to another, until it matured in the written license given to the Chicago Telephone Company, under date of December 23, 1881. That harmonization agreement was signed for the Bell Company of Boston by its president, and for the American District Telegraph Company of Chicago by Anson Stager, one of its directors and a vice president of the Western Union Company, who had participated in the making of the contract of November 10, 1879.

"The omission of Chicago from the list of places in which the Bell had granted licenses or made agency contracts might also be explained on the theory that no place was intended to be included in the list except those with respect to which licenses or agency contracts had been actually executed and issued, which was not the case in Chicago. The Bell Company treated Chicago as a place which was still entirely in its own control, though it had agreed to give a license to its local company there.

"For another reason, independent of those already stated, I ruled that the Chicago stock is not subject to this accounting. The contract of November 10, 1879, provided (article 11 [1]) that places where conflicting interests remained to be harmonized (of which Chicago was one) should be exempt from the operation of this contract' until such harmonization was effected. This was agreed upon as to Chicago on June 15, 1880, after which the Bell Company received no stock except in exchange for stock issued to it prior to November 1, 1879, and stock in payment of the local company's cash indebted-

187 F.—30

ness to it. But the actual harmonization was considerably delayed. Though intended to take effect on July 1, 1880, it was not in fact effected till the organization of the Chicago Telephone Company some time after January 13, 1881, the transfer to it by the Union Company, March 1, 1881, and the issue of a Bell license to it December 23, 1881."

In conclusion the master ruled as follows:

"I therefore ruled that the defendant is not bound to account for any of the stock of the Chicago Telephone Company received by it. I have therefore deducted from the amounts claimed to be due to the plaintiffs in this accounting 20 per cent. of the shares of that company received by the defendant, to wit, the 396 shares claimed in Exhibit D2, together with the dividends on those shares, amounting to $165,984.50, and interest on the dividends to April 1, 1909, amounting to $175,739.58, making in all $341,724.08, as shown in Exhibit J."

The rulings of the master with respect to this stock come within the same principle which was applied in the cases of the American Telephone & Telegraph Company and the New England Telephone & Telegraph Company, and hence come within the limitations of the accounting laid down in the opinion of the Circuit Court of Appeals.

I have considered the most important rulings of the master to which exceptions were taken. As to the master's ruling that the burden of proof rests on the defendant, it seems to me that he was clearly right; and the same is true of his ruling that this stock was subject to a commission of 30 per cent. The remaining exceptions do not appear to call for particular consideration.

Upon the whole, I find no error in the master's rulings.

The exceptions to the master's report are overruled, and the report confirmed; and a decree may be drawn accordingly.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Received for publication June 7, 1911.