WESTERN UNION TELEGRAPH CO. et al. **v.** AMERICAN BELL TELE-
PHONE CO.

AMERICAN BELL TELEPHONE CO. v. WESTERN UNION TELEGRAPH
CO. et al.

(Circuit Court of Appeals, First Circuit. March 18, 1913.)

Nos. 938, 939.

1. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACTS BETWEEN COMPANIES—
STOCK DIVISION—ACCOUNTING—APPORTIONMENT.

Complainant transferred to defendant all its telephone business and
patents in consideration of a payment by defendant of 20 per cent. of all
rentals or royalties received from licenses or leases for telephones. De-
fendant granted perpetual licenses to local companies and exchanges, re-
ceiving therefor a proportion of the stock of each local company, and also
rentals for instruments used by it. *Held*, that such stock so received
having been held to be rentals or royalties within the contract, and de-
fendant having so confused its receipt thereof that there was no practical
basis on which an apportionment could be worked out on the theory that
the contract only ran for 17 years during the life of the patent, while
the licenses were unlimited, a decree refusing apportionment was proper.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig.
§ 10; Dec. Dig. § 16.*]

2. APPEAL AND ERROR (§ 1071*)—REVIEW—PREJUDICE—EVIDENCE—REFUSAL
OF MASTER TO REPORT.

Refusal of a master to take down all the evidence which defendant
proposed to introduce and report the same to the court was not ground
for reversal of a decree entered on the master's report, where the matter
so eliminated proved to be immaterial.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4234–
4239; Dec. Dig. § 1071.*]

3. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACT BETWEEN COMPANIES—
ACCOUNTING.

Where defendant telephone company agreed to pay complainant tele-
graph company 20 per cent. of all rentals and royalties received from
licenses or leases for telephones in consideration of a transfer of com-
plainant's telephone business, defendant was not relieved from liability
to account for 20 per cent. of such receipts by reason of the fact that the
licenses and receipts also included the receipts from private lines, long-
distance telephoning, etc., only to the extent of the qualified use, and
not including any exclusive territorial rights for exchanges or long-dis-
tance telephoning.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig.
§ 10; Dec. Dig. § 16.*]

4. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACT BETWEEN COMPANIES—
ACCOUNTING.

Where defendant agreed to pay complainant 20 per cent. of its receipts
from licenses to use telephones in consideration of a transfer of com-
plainant's telephone business, and defendant received stock in local tele-
phone companies in consideration of licenses to use complainant's phones,
the fact that the licenses stipulated that additional payments might be
made for use of call bells and other incidental matters in which com-
plainant had no interest did not affect complainant's interest in the
stocks so received; defendant never having exacted any additional
royalties on account of such incidentals.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig.
§ 10; Dec. Dig. § 16.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACT BETWEEN COMPANIES—ACCOUNTING—EXTRATERRITORIAL OR PRIVATE-LINE SERVICE.**

A contract, by which defendant agreed to pay complainant 20 per cent. of the amount received from telephone licenses, provided that the right to connect telephonic district or exchange systems for the purpose of personal conversation between persons at the instruments, and the right to use telephones on all lines not forming a part of a telephonic district or exchange system for such personal conversation, were to remain exclusively with the defendant. *Held* that, where there was no evidence that defendant, in good faith, ever made any specific grant of the use of a specific number of telephones on lines between telephone exchanges known as extraterritorial lines, independent of any licenses for telephones, it was not entitled to any deduction in its accounting for extraterritorial or private-line telephoning.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 10; Dec. Dig. § 16.*]

**6. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACTS BETWEEN COMPANIES—ACCOUNTING—EXPENDITURES.**

Where defendant held stock in certain telephone corporations, a percentage of which belonged to complainant under a contract, voluntary expenditures made by defendant in order to increase the value of such stock, for which no obligation was assumed in any way by complainant, could not be considered in determining the amount complainant was entitled to receive.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 10; Dec. Dig. § 16.*]

**7. TELEGRAPHS AND TELEPHONES (§ 16*)—CONTRACTS BETWEEN COMPANIES—CONSTRUCTION—DIVISION OF RENTALS.**

As there was only one equity which the Western Union is entitled to the benefit of, the stocks to be accounted for were subject to the commission of 30 per cent. nominated in the contract.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 10; Dec. Dig. § 16.*]

Appeals from the Circuit Court of the United States for the District of Massachusetts; Le Baron B. Colt, Judge.

Suit in equity by the Western Union Telegraph Company and others against the American Bell Telephone Company. From a decree (187 Fed. 425) confirming a master's report, both parties appeal. Affirmed.

Josiah H. Benton, of Boston, Mass., and Rush Taggart, of New York City, for Western Union Telegraph Co.

Frederick P. Fish, John C. Gray, and Roland W. Boyden, all of Boston, Mass. (Charles H. Swan, of Boston, Mass., on the brief), for American Bell Telephone Co.

Before PUTNAM, Circuit Judge, and ALDRICH and BROWN, District Judges.

PUTNAM, Circuit Judge. These are cross-appeals from a judgment entered in the Circuit Court for the District of Massachusetts on February 20, 1911. This bill was brought originally by the Western Union Telegraph Company against the American Bell Telephone Company, and, after various proceedings in the Circuit Court, came to this court on appeal by the Western Union Telegraph Company and

---

its coproponents against a decree in the Circuit Court in favor of the respondent there, the American Bell Telephone Company. On October 6, 1903, we entered a judgment as follows:

"The decree of the Circuit Court is reversed; the case is remanded to that court to enter a decree for the complainants for an accounting and for further proceedings in accordance with our opinion; and the appellants recover their costs of appeal."

Pursuant to this judgment a mandate duly issued to the Circuit Court for the District of Massachusetts, which latter court referred the case to a master, which master duly made his report to the Circuit Court in favor of the complainants; and thereupon such proceedings occurred that the Circuit Court passed down its opinion on February 20, 1911 (187 Fed. 425, and sequence), and entered a final decree in favor of the complainant, the Western Union Telegraph Company, on April 4, 1911, as follows:

"Colt, J. This case came on to be heard before me upon the master's report, the plaintiffs' exceptions thereto, filed September 28, 1909, the defendant's exceptions thereto, filed October 15, 1909, respectively, and upon the motion of the plaintiffs, filed October 28, 1909, as to confirmation of the master's report.

"The case was argued by counsel, and upon consideration thereof it is ordered, adjudged, and decreed that the exceptions to the master's report are overruled and the report confirmed.

"And it appearing that the Bell Telephone Company of Buffalo, the Central New York Telephone & Telegraph Company, the Empire State Telephone & Telegraph Company, the Hudson River Telephone Company, and the New York & Pennsylvania Telephone & Telegraph Company have since April 1, 1909, been consolidated with other companies and are no longer in existence, and that in connection with such consolidation the defendant received for its shares in said Bell Telephone Company of Buffalo on September 30, 1909, the sum of $93.50 per share, for its shares in the Central New York Telephone & Telegraph Company on April 30, 1909, the sum of $65 per share, for its shares in the Empire State Telephone & Telegraph Company on April 27, 1909, the sum of $40 per share, for its shares in the Hudson River Telephone Company on April 27, 1909, the sum of $66⅔ per share, and for its shares in the New York & Pennsylvania Telephone & Telegraph Company on April 27, 1909, the sum of $50 per share, and it appearing further that the name of the City & Suburban Telephone Association has been changed to the Cincinnati & Suburban Bell Telephone Company, it is further ordered, adjudged, and decreed that the defendant assign, transfer, and deliver to the plaintiffs within 60 days—

| | |
|---|---|
| 168 | shares of the capital stock of the Bell Telephone Company of Missouri; |
| 1,281.46669 | shares of the capital stock of the Bell Telephone Company of Pennsylvania; |
| 698.775 | shares of the capital stock of the Central District & Printing Telegraph Company; |
| 1,700.0844 | shares of the capital stock of the Central Union Telephone Company; |
| 2,116.8 | shares of the capital stock of the Cincinnati & Suburban Bell Telephone Company; |
| 392 | shares of the capital stock of the Cleveland Telephone Company; |
| 1,292.256 | shares of the capital stock of the Colorado Telephone Company; |
| 1,581.06578 | shares of the capital stock of the Cumberland Telephone & Telegraph Company; |
| 154.56 | shares of the capital stock of the Michigan Telephone Company; |
| 616.9156 | shares of the capital stock of the Missouri & Kansas Telephone Company; |

560.69419 shares of the capital stock of the Nebraska Telephone Company;

3,360.42  shares of the capital stock of the New England Telephone & Telegraph Company;

779.94    shares of the capital stock of the Northwestern Telephone Exchange Company;

322.98    shares of the capital stock of the Providence Telephone Company;

273       shares of the capital stock of the Rocky Mountain Bell Telephone Company;

490       shares of the capital stock of the Southern Bell Telephone & Telegraph Company;

735       shares of the capital stock of the Southern New England Telephone Company;

840       shares of the capital stock of the Southwestern Telegraph & Telephone Company;

428.68    shares of the capital stock of the Wisconsin Telephone Company.

"And it is further ordered and decreed that the defendant pay to the plaintiffs the sum of $1,645,765.49, being the principal sum found to be due by the master as of April 1, 1909, together with $934,149.15, the amount of interest found to be due by the master as of April 1, 1909, together with $194,748.92, being interest upon the aforesaid principal sum from April 1, 1909, to March 20, 1911, together with $172,023.77, being the cash dividends received on stocks enumerated by the master between April 1, 1909, and March 20, 1911, and $10,888.51, being interest on said dividends from the dates when they were respectively received to March 20, 1911, together with $162,028.53, being the payments received by the defendant for the shares of stock in the Bell Telephone Company of Buffalo, the Central New York Telephone & Telegraph Company, the Empire State Telephone & Telegraph Company, the Hudson River Telephone Company, and the New York & Pennsylvania Telephone & Telegraph Company, to which, under the terms of the master's report, the plaintiffs are entitled, together with $17,035.94, being the interest upon said payments from the times when they were respectively received to March 20, 1911.

"And it also appearing that on September 15, 1909, the defendant received a stock dividend of 2 per cent. on the shares held by it in the Cumberland Telephone & Telegraph Company, which was paid to it in stock of the American Telephone & Telegraph Company at par, of which stock 31.6213 shares should be transferred to the plaintiffs, and that on October 15, 1909, the defendant received a dividend on said shares thus due to the plaintiffs of $63.24, and that on November 19, 1909, it sold said shares at $141.12 per share, amounting to $4,462.40, it is further—

"Ordered and decreed that the defendant pay to the plaintiffs said dividend, and the amount received for said shares, being together $4,525.64, and interest thereon from the time when said dividend and the price of said shares were respectively received to March 20, 1911, amounting to $363.16, being a total of $4,888.80. The total amount thus ordered and decreed to be paid by the defendant to the plaintiffs, with interest thereon from March 20, 1911 (to which date interest has been computed in making this decree), until paid, is three million, one hundred forty-one thousand, five hundred twenty-nine dollars and eleven cents ($3,141,529.11)."

From this final decree the complainants and the American Bell Telephone Company each entered an appeal to us, which are the appeals now under consideration.

It is convenient throughout this opinion to use the expression "Western Union" as denoting all the original complainants, and the expression "American Telephone" as designating the original respondent.

We perceive it necessary to observe that we do not find in the briefs any concise statement presenting succinctly the questions involved in

the manner in which they are raised, or any setting out separately and particularly of each error asserted and intended to be urged, all as required by our rules, and all in such manner that we are sure we completely apprehend all and fully what is intended by the parties to be brought to our attention in the manner so intended. If, therefore, we have overlooked any considerations, it must be attributed, at least in part, to this deficiency, and not be regarded wholly as our own inexcusable failure.

It is not necessary to set out specifically the errors assigned, as there is no claim that the Circuit Court omitted to rule upon any of the matters to which they relate. Therefore, the substance of all of them will be found by turning to the opinion of the Circuit Court, reported, as already stated, in 187 Fed. 425. There were opinions rendered in both the Circuit Court and the Circuit Court of Appeals prior to those which we have already cited; but it is not necessary to recur to them. Moreover, the opinions already referred to of this court of October 6, 1903 (125 Fed. 342, 60 C. C. A. 220), and of the Circuit Court of February 20, 1911 (187 Fed. 425), so fully state the facts herein involved and the conclusions of law heretofore reached that it would be a mere tedious waste of time to undertake to set them out anew. Also, the Circuit Court in its opinion of February 20, 1911, so closely followed the opinion of this court of October 6, 1903, and its mandate issued in pursuance thereof, that it is not necessary to reiterate the conclusions of law now involved, except as to specific matters which we will especially consider herein.

The issues involved are so important, the facts to which they relate are so extensive, and the propositions of counsel pro and con were discussed, as they properly should have been, at such length and with such ability that necessarily our review of the conclusions of the Circuit Court, as shown by its opinion of February 20, 1911, has occupied much time, and has even delayed the case on account of our desire to revise from time to time the impressions which we had received. In this connection we must observe that counsel have, directly and indirectly, challenged with considerable detail the conclusions we reached and embodied in our interlocutory decree; and yet we have been unable to justify ourselves in changing the views which were therein given effect. Consequently, we confine this opinion to those matters of detail which were not brought to our attention before the interlocutory decree was entered, and which naturally did not arise until the report of the master came in. Fortunately, while these matters are of much consequence, and required much attention from the parties, the Circuit Court, and ourselves, the conclusions we have finally reached can be put in comparatively simple form.

[1] We will first consider what may be called the question of apportionment. This was a matter of detail, which, of course, was never in order for discussion by us until now.

The brief for the Telephone Company says as follows:

"This means simply this: The Western Union cannot possibly be entitled to share in all the stock. If entitled to share in stock at all, it is fairly entitled to share only in a part, and the smaller part, of each stock payment.

Considering the question broadly, and without resort to mathematics, it is plain that more than half of the stock must be eliminated from the accounting, because more than half of each stock payment represents a commutation or advance payment of additional rentals which, if received at all, would have been received after November 1, 1896, when the right of the Western Union to share in rentals ceased."

This proposition was met by the learned judge of the Circuit Court in the following language:

"I find nothing in the opinion of the Circuit Court of Appeals to warrant an apportionment of either dividends or stock, as claimed by the defendant. The telephone patents were combined in the hands of the defendant under the contract of November 10, 1879. The contract ran for 17 years, and patents are granted for 17 years. This, therefore, was the period of the monopoly secured by the patents, and hence the period during which these patents would be by far the most valuable. Under these conditions it would seem quite impossible to apply any equitable or satisfactory method of apportionment to this stock.

"Again, so far as the Court of Appeals has in any way referred to this subject, what it said is against the defendant's claim. In the first place, it treats this stock as the equivalent of money. Further, in the course of its opinion, the court observes:

"'If, for example, in lieu of the "ten dollars per annum," named in paragraph 2 of article 1, the telephone company received, either in shares of stock or money, $100 for a 10 years' license, which seems to have been commonly granted, or $170 for a perpetual license, which would mean the entire 17 years for which the contract ran, either hypothesis readily computes an annual rental of $10; and, if received in advance, it must likewise be accounted for in advance.'

"The court here appears to treat the period of 17 years, as applied to the contract of November 10, 1879, as the equivalent of a perpetuity, although it cannot be said that this language of the court is a conclusive finding on this question."

The Circuit Court also quoted quite at length from the findings and rulings of the master. It was of the opinion that it was somewhat guided by what had been already said by the Court of Appeals; but this question was not considered by the Court of Appeals, as already said. We, however, accept the proposition of the learned judge of the Circuit Court to the effect that the conditions were such that "it would seem quite impossible to apply any equitable or satisfactory method of apportionment to the stock" to which the learned judge particularly referred.

We, however, dispose of all questions of apportionment as follows: On the whole, we conclude that, while there might be some equity for apportionment, we are compelled to accept broadly the conclusion on this topic of the learned judge of the Circuit Court, because there is no practical basis on which apportionment could be worked out. This is on the ground that the substance of what was conveyed by the telephone company to its licensees and grantees of all kinds was the use of the telephones during the life of the patents which it controlled, and which were coterminous, for the most part, with the contract on which this suit is based; and because, also, everything for the period which might follow the expiration of the contract was of an evanescent and disappearing character, which could not possibly be estimated, and which, in the light of the subject-matter of the contract, involved nothing for which any party, any licensee or any grantee,

yielded any consideration within the four corners of these proceedings. This condition, and these consequences thereof, arise out of the fact that the telephone company voluntarily accepted, in lump, single undivided considerations, and this during the currency of the contract on which this suit is based; and though in certain instances and certain aspects the considerations might have been of a continuing character, the fact that they were indivisible in their nature was caused by the voluntary action of the telephone company. While not particularly illuminating so far as this case is concerned, yet for one who desires to know how far reaching, under equitable rules, is the doctrine of confusion of goods, we refer to the latest application thereof by the Supreme Court in Westinghouse Co. v. Wagner Co., 225 U. S. 604, 614, 615, 618, 621, 622, 32 Sup. Ct. 691, 56 L. Ed. 1222.

A question is raised with reference to the refusal on the part of the master to admit certain evidence offered by the telephone company. We are unable to find this stated in a form in which we can comprehend it with certainty, except as given in the opinion of the learned judge of the Circuit Court, as follows:

"Stated more fully, the defendant contended that under the decision of the Circuit Court of Appeals the recovery by the plaintiffs under article 1 of the contract of November 10, 1879, was limited to such portion of this stock as may be attributed to the right or license to use telephones, and that the defendant was entitled to show various other considerations for this stock, both within and outside the terms of the license contracts. Among these other considerations the defendant claimed the following:

"1. Value of connection with the Bell system.

"2. Value of right to use subsidiary apparatus.

"3. Value of right to carry on extraterritorial business.

"4. Value of surrender of options.

"The master limited his inquiry into this subject of consideration to the license contracts themselves, and excluded the defendant's testimony as to the value of considerations outside these contracts; that is, the value of considerations involved in the licensee's connection 'with the great Bell organization, protection against patent suits and infringements, financial assistance, the services of its great engineering and electrical talent, the connection with its extraterritorial lines, and the whole extraterritorial business.'"

This is apparently, in part at least, what was referred to in the arguments before us by the telephone company when it urged with fullness that the telephone offered only the possibility of profit which would never have come into being without other machinery just as essential as the telephone itself; that the profits could not have been obtained without the control of the essential additional apparatus; that the Bell Company could not utilize its opportunities, unless it could devise and control an efficient organization and system of carrying on its business; that the Bell Company controlled the telephone after the most arduous struggle; that it developed, bought, and controlled the other essential apparatus and the patents upon it; that, in this and other ways explained by it, it developed the possibility of profits into reality, and brought these profits into the Bell treasury; and that these and other incidental features became of the utmost importance. All this was a matter of course, unless it was assumed that the owner of the telephone patents was to be absolutely supine, and wait for an

overruling Providence to give it the profits which might possibly ensue. In other words, all this was bargained for in the contract of 1879, on which this litigation rests. It was covered in advance by the agreements contained in that contract for the apportioning of the financial results.

[2] The telephone company, however, claims that, under the rule in Blease v. Garlington, 92 U. S. 1, 23 L. Ed. 521, the master was bound to take down seriatim, and perhaps verbatim, all the evidence which the telephone company proposed to introduce, and report it to the court. As the evidence offered was so far outside the case, we cannot conceive that the telephone company can complain to us effectively on that account. The master, moreover, did, in an exhibit attached to his report, give an outline of the evidence offered and which he excluded, stating that he gave its subject-matter and general purport. We are not prepared to admit that Blease v. Garlington requires in any view more than this, or especially that it requires us, as the final court of appeal, to reverse the judgment of the Circuit Court on account of any matter which would prove to be immaterial; and we will await further instructions from the Supreme Court before acceding to such propositions.

[3] So far as the "value of the surrender of options" is concerned, the topic has been treated by the learned judge of the Circuit Court in precisely the manner pointed out by us. As for the rest, so far as anything here involved is concerned, the licenses were all expressed to be mainly for the use of telephones. So far as they related to private lines and long-distance telephoning, they gave only a qualified use, which was even less than the full use which might have been given; so that, as a part cannot be more than the whole, the conclusions of the learned judge of the Circuit Court on this topic will be found to have been right. It might have been otherwise if the several licenses had expressly included exclusive territorial rights for exchanges or long-distance telephoning.

[4] Coming to the proposition in the opinion of the learned judge of the Circuit Court, to the effect that the telephone company claims that the stocks received by it were not to be attributed solely to the licenses to use telephones, but to various other considerations, both within and without the terms of the license contracts, it is said that, while the licenses stipulated that additional payments might be made for the use of call bells and other incidental matters, yet in fact no such payments were made; the proposition being that the lessees, from the beginning, used all this incidental apparatus by virtue of the provisions in the licenses, and that the telephone company never did exact additional royalties on that account. Whether it be so or not becomes immaterial in this case, because, if the telephone company had exacted them, the complainant would not have been entitled to anything additional on that account. If it did not exact them, it was for considerations, of course, of its own, as to which, so far as this record is concerned, the Western Union had no part and no concern.

[5] A more serious difficulty arises from the following provision of article 13 of the contract in suit here, as follows:

"(1) The right to connect telephonic district or exchange systems for the purpose of personal conversation between persons at the instruments, and the right to use telephones on all lines not forming a part of a telephonic district or exchange system for such personal conversation (except so far as licenses for private lines are to be granted to the party of the first part under article 14) are to remain exclusively with the party of the second part, and those licensed by it for the purpose."

There are some qualifying sentences following, which are not necessary to be repeated here. It is plain that, if peculiar rights to connect, or other specific rights for what are called here extraterritorial or private-line telephoning, could have been and had been granted by the telephone company as essential subject-matters, and, as it were, independently of any licenses for telephones, what might have been in good faith received therefor could not have come into this accounting; but there is no proposition here of anything of that nature, and there is no evidence of a tangible character that the telephone company ever received anything for such grants. Turning, for example, to the sample contract for extraterritorial connecting lines, we find that it starts with a grant of the use of a specific number of telephones upon lines between telephone exchanges, which is what is covered by the expression "extraterritorial lines." The telephones, however, were limited by the licenses to these specific uses. The contracts, of course, provided that each licensee might "avail itself of, and enjoy, the right of connecting with the exchange systems established within said territory": that is, the territory within which, according to what preceded, the licensed telephones might be used. This additional privilege contained certain modifications and restrictions, which we need not recite.

The learned judge of the Circuit Court quoted extensively from the report of the master, showing the grounds upon which he made no allowance to the telephone company on this account, and affirmed the master's position. We reaffirm the conclusions of the learned circuit judge by also quoting from the master. We apply what we quote alike to extraterritorial lines and private lines, noting, however, that in this the master laid aside from his consideration "subscriptions and tolls" being moneys received for rights to erect connecting lines between different exchanges and to connect them with such exchanges, and possibly something else. He then stated as follows:

"I ruled that the extraterritorial licenses, for which stock was in part taken, granted more than the right to use and rent telephones on extraterritorial lines, to wit, the right to construct such lines, connect them with exchanges, and carry on a connecting line business with them; and that the latter right rested upon a different consideration than the right to use and rent telephones; and also that the stock issued under the agreements for such licenses was attributable to the licenses as a whole, and not to any separable part or feature of them. But I ruled that, as in the case of exchange licenses, the main grant was of the right to use telephones, as shown by the express declaration of the licenses themselves that the 'right and license hereby granted is the right and license to use said telephones' to carry on personal communications between different exchange districts over extraterritorial lines, etc. (O. R. p. 453); and that the right to build, connect, and operate connecting lines, etc., while important and essential to these particular licensees, as the right to use call bells and other subsidiary apparatus was important and essential to all licensees, was nevertheless incidental to the main grant.

"The evidence which I considered material furnished no means of ascertain-

ing the values of the different licenses or their respective values in comparison with each other, except that 'the extraterritorial licenses were regarded as less valuable than exchange licenses (D. E. 994) and more valuable than private-line licenses (D. E. 995). And if the two parts or grants or extraterritorial licenses above referred to should properly be regarded as distinct and severable, and the stocks issued for such licenses (if ascertainable) apportionable between the two, the evidence furnished no tangible rule or method by which any definite finding of such relative values could be made. Defendant asserted in its final brief that the license contracts themselves did not indicate or suggest any method of determining the comparative values of the different licenses for which the stock was issued. Nor did the extraterritorial licenses indicate or suggest any method of determining the comparative values of the different rights granted by them. I therefore declined to make any deduction from the stocks to be accounted for, on the ground that they were received in the case of extraterritorial licenses in part for something other than the mere right to use and rent telephones."

As to private-line business, whatever is said in reference to the extraterritorial lines covers it fully. On the whole, there stands the essential fact that the licenses for the two classes of lines granted only qualified uses of telephones, less than the full uses which might have been given. As licenses for telephones limited to extraterritorial uses or private-line uses would not be available, except with the right to use those lines, that right might well have been assumed as incidental, even though not granted in terms; and this so far that without that right these limited telephone licenses would have been incomplete and ineffectual.

For this reason no independent grants relative to private lines and extraterritorial lines were called for, and therefore none were given.

Much has been said before us about the definitions of "rentals" and "gross rentals," and distinctions have been undertaken with reference thereto; but this was all disposed of by us in 1903, and needs no further consideration.

What we have said about apportionment, exchanges, and long-distance telephones disposes for this case of all the propositions made by the respondent, to the effect that the permanent rights granted in exchange for the stocks to which this case largely relates were of the greatest importance and value. This is only another aspect of the same topics.

[6] The claims made by the respondent for reimbursements, or quasi reimbursements, considered in the opinion of the learned judge of the Circuit Court, were correctly disposed of. The expenditures made were of a purely voluntary character, for which no obligation was assumed in any way by the complainants; so that they could not be made the basis for any claim of compensation, either at law or in equity.

The observations in reference to the question of reimbursement cover completely the claim that the accounting heretofore accomplished between the corporations should be reopened and readjusted. It is only another aspect of the same thing; and for that reason, and also for the reasons stated by the learned judge of the Circuit Court, none of the propositions of the respondent in reference to this topic can be maintained.

In behalf of the Western Union, it is maintained that the rulings of the learned judge of the Circuit Court with reference to four specified exchanges, at Philadelphia and elsewhere, so far as favorable to the telephone company, were erroneous; but the obstruction which stands in the path of the Western Union as to these exchanges is that, while it derives its remedy in this case wholly from the application of the most far-reaching rules of equity as applied to the relations of trustee and cestui que trust, whether technically or only substantially such, it overlooks the corresponding ability of equity in behalf of the telephone company to trace through the whole of a series of transactions in order to determine the rights of the parties in view thereof, even though in the courts of the common law some links might be missing, and the original motive power have ceased to operate. Having in view all that both parties are entitled to in the light of fundamental equitable rules, it is clear that the learned judge of the Circuit Court was also right in his conclusions as to this topic. For those who desire to follow through all the series of events, either plainly connected with each other or only obscurely so, we refer them to the histories of these four exchanges told by the master, because it is only the general principle which we state which would be of any importance in any subsequent litigation. No future litigation can possibly reproduce the special states of facts which we are dealing with; and therefore nothing would be gained by dwelling on them.

[7] The Circuit Court ruled that the stocks to be accounted for by the telephone company were subject to the commission of 30 per cent. reserved in the contract under consideration. As there was only one equity to which the Western Union is entitled to the benefit of, it must, of course, take that equity with all analogies relating to what was specifically nominated in the contract; therefore this ruling was plainly correct.

Both parties having appealed, and each appeal failing, on each appeal the judgment is:

The decree of the Circuit Court appealed from is affirmed, without interest, and without costs to either party.